UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT
OF TENNESSEE

_____

| | |
|---|---|
| J.L., THE STUDENT, AND S.L. AND M.L., ) | |
| THE STUDENT'S PARENTS, ) | |
|     PLAINTIFFS ) | |
| ) | |
| v. ) | Docket No: _____ |
| WILLIAMSON COUNTY BOARD OF EDUC. ) | |
| a/k/a WILLIAMSON COUNTY SCHOOLS, ) | |
|     DEFENDANT. ) | |
| ) | |

_____

# COMPLAINT
_____

**COMES THE PLAINTIFF, J.L.,** through his parent and guardians, S.L. and M.L. They show:

## I. PARTIES, JURISDICTION, AND VENUE

1. J.L. resides with his mother and father, S.L. and M.L., in Spring Hill, Tennessee, in Williamson County.

2. The Williamson County Board of Education is the educational entity providing a public education to students residing in Williamson County. It receives federal funding and must provide special education to persons like J.L. who are eligible students under the IDEA.

3. This action arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.* Jurisdiction is conferred upon this Court by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district

courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff resides within the Middle District of Tennessee and all events and omissions giving rise to this Complaint occurred in Williamson County, within this judicial district.

5. Administrative exhaustion occurred through a state due process hearing with a Final Order by Administrative Law Judge Rachael Waterhouse dated May 17, 2023. Accordingly, this appeal is timely, brought within sixty (60) days thereafter.[1]

## II. INTRODUCTION

6. Why, in Tennessee, is it so difficult for some children with mental disabilities to obtain current Functional Behavior Assessments *before* schools make placement decisions turning on behavior?

7. Once in due process, Tennessee's trial-like system pits parents and teachers against each other in often lengthy proceedings.[2] There, IEP "Team" members become adverse parties and, too often, lose sight of what is a simple, ordered process for placing a student with behavior-related needs: deliver assessments and supports, *then* determine placement. Otherwise, children may be unnecessarily removed from their public schools.

8. This Court has dealt with premature behavioral removals many times before. In *M.C. v. Lebanon*, No. 3:20-0302 (M.D. TN 2020), M.C., too, had an "overwhelming need for a

---

[1] A copy of the Final Order is being filed as an attachment to the Verified Declaration of J.L. as part of the motion for temporary and preliminary injunction.
[2] *See* Zirkel, P., *Creeping Judicialization in Special Education Hearings? An Exploratory Study*, Jrnl. of the National Association of Administrative Law Judiciary Vol 27, Issue 1 (2007).

Functional Behavior Assessment (FBA) followed by a Behavior Intervention Plan" but the school district excluded her.[3] At the first hearing, District Judge Campbell sensibly asked the Plaintiff if she wanted a Functional Behavior Assessment—"yes"—and asked the Defendant school system if it were willing to give the FBA—again "yes"—and then ordered the parties to mediation.[4] The matter resolved.

9. In *J.A. v. Smith County*, it took an order from Magistrate Judge Brown to get the FBA in the regular education classroom before excluding the child. Judge Brown ordered that "J.A. be placed in kindergarten at NMES with a paraprofessional properly trained … and for the District to conduct an FBA and implement a BIP." *J.A. v. Smith Cty. Sch. Dist.*, 364 F. Supp. 3d 813, 839 (M.D. Tenn. 2018), *recommendation of Magistrate Judge affirmed* at 364 F.Supp. 803 (M.D. Tenn. 2019).

10. The importance of an FBA to determining a properly drawn IEP is now a path well-worn. None other than the *Endrew F. v. Douglas Cty. Sch. Dist.*, 580 U.S. 386 (2017) illustrates it. *Endrew,* the student, also had multiple behavioral challenges requiring supports: He would "scream in class, climb over furniture and other students and occasionally run away from school." *Id.* at 395.

11. After the Supreme Court defined what is meant by *functional FAPE*, the lower court found that the lack of appropriate behavioral supports denied *Endrew F.* a free appropriate public education. *Endrew F. v. Douglas Cty. Sch. Dist.*, 2018 U.S. Dist. LEXIS 22111 at **19, 21-23

---

[3] See 3:20-0302, D.E. 14, Am. Complaint, ¶6.
[4] *Id.* at D.E. 57.

3

(D. Col. Feb. 12, 2018). Like *M.C., J.A.,* and now *J.L.,* the district court explained the importance of behavioral plans to delivering FAPE:

> The District's inability to develop a formal plan or properly address Plaintiff's behaviors that had clearly disrupted his access to educational progress starting in his second grade year does, under the new standard articulated by the Supreme Court in this case, impact the assessment of whether the educational program it offered to Petitioner was or was not reasonably calculated to enable him to make progress appropriate in light of his circumstances. The District's inability to properly address Petitioner's behaviors that, in turn, negatively impacted his ability to make progress on his educational and functional goals, also cuts against the reasonableness of the April 2010 IEP.

*Id.*

12. Here, too, J.L. requires an updated Functional Behavior Assessment *so that* he will not be prematurely judged and placed in a too-restrictive environment with zero access to peers.

13. WCS rushed to remove J.L. to highly restrictive settings in 2021 and 2023 before allowing an updated FBA. And it takes the position that J.L.'s "stay put" protection is just as bad: a homebound placement of only several hours per week, still with zero access to peers.

14. These legal maneuvers make obtaining an updated FBA in the regular education classroom an impossibility. Accordingly, this action seeks to restore J.L. to his regular education classroom due to a denial of FAPE in the LRE and/or the "stay put" provisions of the IDEA. Notably, the relief on the merits and through stay put is consistent: return him to the classroom *so that* an updated FBA can be conducted, a condition precedent to a properly drawn IEP including placement.

## II. FACTS

15. J.L. has a qualifying educational disability of "emotional disturbance" for his medical diagnoses of Disruptive Mood Dysregulation Disorder (DMDD) and Attention Hyperactive Disorder (ADHD).

16. The brain-based nature of DMDD involves chronic irritability and recurrent temper outbursts. (Final Order, FF ¶4). As reported by J.L.'s neuropsychologist in 2019, when J.L. was nine years old, "as J.L. gets older, the frontal lobes of his brain will mature, which will result in improved self-regulation." (*Id.* at FF ¶49)

### ELEMENTARY SCHOOL

17. In elementary school at WCS, J.L. did not have any history of *academic* deficits and, in fact, was regarded as a very bright young boy. But consistent with this disability, J.L. did have a history of episodes of aggression, hitting, running, and verbal outbursts both at home and school. (*Id.* at ¶6).

18. J.L.'s last agreed upon IEP was September 5, 2019, where he was placed in a regular education classroom with both a Functional Behavior Assessment and a Behavior Intervention Plan.

19. In the 2019-2020 school year, when J.L. was nine, conflict arose concerning J.L.'s behavior and his placement. Both J.L. and WCS filed Due Process Complaints.

20. These Complaints were settled privately with agreements that J.L. would temporarily be placed on homebound, but then attend Robson Academy, a private school. Importantly, by agreement, the private school would not be considered his "stay put" placement.

5

21. Rather, the last agreed-upon placement remained that of September 5, 2019. That IEP placed J.L. in the regular education classroom "to the fullest extent" and he was able to participate with his peers. Moreover, most of the special education services for social/emotional behavior were to be delivered in "general education." And that IEP itself provided for a Functional Behavior Assessment and Behavior Intervention Plan.

### J.L. Seeks Return to WCS for Middle School

22. For a variety of reasons, the Robson Academy experience was inadequate. So in April or May of 2021, J.L., then 11 years old, gave notice of his intent to return to his zoned public school at WCS's Spring Station Middle School. He enrolled for sixth grade at Spring Station, with his last agreed upon IEP being the one from September 5, 2019 that provided him with both a Functional Behavior Assessment and Behavior Intervention Plan.

23. Because J.L. had been out of the public school, the last Functional Behavior Assessments (FBA) remained those from his elementary school years, 2019 and 2020.[5] Generally, it takes about six weeks to conduct an FBA, to learn the triggers behind any behaviors in a given setting.

24. On August 3, 2021, WCS decided J.L.'s placement *without* performing an updated FBA. WCS sought to place J.L. on *homebound* for 8 hours per week to be followed in three-weeks-time by a "*therapeutic day school*" outside of WCS. WCS offered three examples of such "therapeutic day schools": Genesis Academy, High Roads Academy, and Rutherford Academy.

---

[5] The 2020 FBA, the latest one, showed improved behaviors. It included "staff interviews" stating that "[J.L.'s] challenging behavior has decreased in severity and frequency since December 2019." The staff "attributed this to fidelity of implementation of his current BIP." Additionally, staff had been "unknowingly reinforcing [J.L.'s] challenging behaviors."

6

25. Like many of the WCS IEP team members, J.L.'s mother, S.L., had never seen, and therefore could not evaluate, these highly restrictive placements outside of WCS. This was acknowledged by no less than WCS's special education teacher (Ms. Teri Driver), J.L.'s principal at his last WCS placement (Ms. Jill Justus), and WCS's own retained expert in psychology (Dr. Clovis Stair). Parents must understand where the IEP team is proposing a child be sent, the special or general education curriculum offered at that location, the type of supports, and the distance from home.

26. Instead of pumping the brakes on the placement, and affording time to conduct an FBA in a regular education setting, WCS issued a "Prior Written Notice" on August 4, 2021. That notice carried a legally operative effect. Once issued, a school district's proposed change of placement takes effect in "fourteen (14) days" absent a request for a due process hearing. State Board of Education Rule 0520-01-09-.13.

27. The August 4, 2021 Prior Written notice gave J.L. a "homebound" placement with shortened hours, followed by removal to a "therapeutic day school" outside of WCS.

28. On August 5, 2021, WCS confirmed to J.L.'s mother, in writing, that J.L. "should not show up at Spring Station, as his educational placement is *homebound* and his IEP services will be provided in the homebound setting."[6] WCS stated that the proposed IEP sent August 4, 2021 is the "final proposed IEP from the District" and *"[t]he IEP will go into effect"* on day-fifteen, August 19, 2021.[7] Importantly, WCS stated that a therapeutic placement already had been

---

[6] This is Due Process Hearing Exhibit 12.
[7] J.L.'s mother could not visit all of them within the fourteen-day Prior Written Notice period. She visited on August 19, 20, and September 1, 2021, respectively. When she did, she discovered lack of non-disabled peers, no same age peers, and no extracurriculars like band, music, art, or even a library. That final proposed IEP stated, on page 25, that homebound instruction

7

determined and all that remained was "to determine *which school* would be a good fit for [J.L.]." In other words, *whether* a therapeutic school would be the placement already was decided; only *which* school remained.

29. J.L. and his advocate disagreed. He also retained counsel and filed a Due Process Complaint on August 18, 2021. But even so, WCS took the legal position that, *even under "stay put,"* J.L.'s placement remained that of "homebound." No matter what, WCS would not permit J.L. to return to the regular education classroom to obtain an updated Functional Behavior Assessment and Behavior Intervention Plan that would inform the right placement.

**WCS's December 2021 FBA Lacks Enough Data**

30. Months after making the placement decision, in December of 2021, WCS did conduct an updated FBA. It was performed by WCS's Rachel Hoppe, a board-certified behavior analyst.[8] With J.L. already excluded from the regular education classroom, Hoppe performed her FBA in a "highly controlled environment" of J.L. at home and in a school conference room.

31. Predictably, Hoppe could not determine, in 2021, whether the FBAs from 2019 and 2020 were still valid: "[A]t this time not enough data is available to determine if the function of those behaviors is consistent with previous functional behavior assessments."[9] Ms. Hoppe therefore recommended "an additional functional behavior assessment should be done" if J.L. returns to a "typical school environment"[10]

---

would be provided from August 6, 2021 to August 2, 2022 (the annual period) but, on page 26, that homebound instruction would be "for approximately three weeks."
[8] This is Due Process Exhibit 30, Hoppe FBA Report.
[9] *Id.* at p. 11.
[10] *Id.* at p. 13.

32. To avoid the shortened hours of homebound, J.L. began working with a private tutor for 2021-2022 and then tried a private school, Galileo Preparatory Academy, for the first semester of 2022-2023.

33. Galileo is not a public school. It lacked behavioral supports like WCS possesses such as a Crisis Response Team, and it did not accept federal funding.[11]

34. At Galileo, J.L. experienced some behaviors consistent with the nature of his disability, although he was never expelled and was able to continue attending another semester. However, in December of 2022, J.L. *again* sought to return to WCS with appropriate supports and services.

## J.L. Seeks Return to WCS in 2023

35. Even though Ms. Hoppe had recommended a new FBA back in December of 2021, as hers lacked sufficient data, WCS still did not do it.

36. In 2023, for an annual IEP, WCS proposed J.L. return to WCS with *zero minutes* with non-disabled peers, a 1:1 adult at all times, for a shortened school day, extending over a four-week period. "[T]he WCS IEP team was suggesting a plan where J.L. would have zero time around nondisabled peers, except for transitions."[12]

37. Once again, a highly restrictive placement decision was being proposed by WCS without an updated FBA. J.L.'s parent, by contrast, suggested an *annual* IEP that would allow time

---

[11] WCS did not provide a Crisis Response Team, or such training to Galileo.
[12] Final Order, FF ¶112, 117. Though an *annual* IEP, WCS created it "for a short period of time." (*Id.* at ¶118) Had J.L.'s parents *agreed to* a four week "annual IEP," this would become the new stay put if, in week, five disagreements continued about placement. Zero time around non-disabled peers would be the "last agreed upon" placement. J.L.'s parent *disagreed*, avoiding this potential trap.

9

around nondisabled peers without being in a special education setting.[13] This would allow the FBA to be conducted in a natural setting. Due to the disagreement, J.L. filed for due process.[14]

38. J.L.'s mother and WCS's lay and expert witnesses alike agree that it is absolutely essential to have the assessment and supports *first* so "we can *determine* an appropriate and least restrictive placement."

39. For a child with DMMD, like J.L., the supports *are* behavioral supports. That is, a school district must know the child's triggers in order to prevent them. And the way to find out the triggers, everyone agrees, is through the FBA. Until J.L. is returned to the regular classroom setting, the necessary FBA cannot, and will not occur, because WCS keeps J.L. segregated without any access to the classroom with peers.

40. It is "absolutely" the case that current supports must be delivered first. Here is the testimony on that point from WCS's own psychological expert:

```
12  Do you understand that the issues in this
13  case do include least restrictive environment?
14  A.   Yes.
15  Q.   And do you understand that in order to
16  determine least restrictive environment, we look for
17  supports for the child first?
18  A.   Absolutely.
19  Q.   And, then, based on those supports, we can
20  determine an appropriate and least restrictive
21  placement?  Yes?
22  A.   Yes.
23  Q.   And those supports would include behavioral
24  supports, would they not?
25  A.   Yes.

 1  Q.   And particularly with a child with DMDD,
 2  behavioral supports would obviously be relevant,
```

---

[13] *Id.* at ¶¶120, 121.
[14] J.L. filed Due Process on August 18, 2021 and March 2, 2023, respectively. The August 18, 2021 Due Process Complaint was voluntarily dismissed without prejudice to its refiling, which Plaintiff did with the March 2, 2023 Due Process Complaint.

```
 3  right?
 4  A.     Very relevant.
 5  Q.     And it's very relevant for a child with DMDD
 6  because we absolutely have to know what the child's
 7  triggers are to try to prevent them in a classroom
 8  setting. Would you agree with that?
 9  A.     Yes.
10  Q.     And the way to find out what those triggers
11  are is frequently through a functional behavior
12  assessment, right?
13  A.     Correct.
14  Q.     Where you're literally trying to figure out
15  the function behind the maladaptive behavior, right?
16  A.     Correct.
17  Q.     And, then, once we can isolate the function
18  behind the maladaptive behavior, we can write a
19  behavior intervention plan in the hopes of managing
20  that behavior better. Have I stated that correctly?
21  A.     Yes.
22  Q.     And isn't it accurate that the last behavior
23  intervention plan for this child was in 2019?
24  A.     Say that again, please.
25  Q.     The last implemented behavior intervention
 1  plan for J.L. was in 2019?
 2  A.     That's the last one that Williamson County
 3  wrote?
 4  Q.     That's what I'm asking you, yes.
 5  A.     Yes.
```

(Due Process Transcript, Vol. VII, Clovis Stair, pp. 720-722).

41.     Once again, WCS maintained its position that "homebound," not the last agreed upon IEP from September 5, 2019 was "stay put." Thus, J.L. *again* could not receive an updated FBA to determine an appropriate placement in his least restrictive environment.

### III. LEGAL CLAIMS AND ADMINISTRATIVE HEARING ERRORS

#### A. First Error: Predetermination by Denying Meaningful Participation in August 2021

42.     The IEP-building process prohibits predetermination and denial of meaningful parental participation. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004); *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 790 (6th Cir. 2018). "[A]dequate parental

11

involvement and participation in formulating an IEP . . . appear to be the [Supreme] Court's primary concern in requiring that procedures be strictly followed." *D.S. by & ex rel. R.S. & E.S. v. Knox Cty.*, 2021 U.S. Dist. LEXIS 251103, at *25 (E.D. Tenn. June 21, 2021). It is simply not enough to satisfy the IDEA's provisions that a parent is merely present at an IEP meeting and provided an opportunity to speak. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004)

43. A parent lacks meaningful information about a placement when she does not know "what classroom [the child] would be in, how many transitions [the child] would have to undertake, how many students would be in the class, and what disabilities those students would have." *D.S. by & ex rel. R.S. & E.S. v. Knox Cty.*, 2021 U.S. Dist. LEXIS 251103, at *25 (E.D. Tenn. June 21, 2021). Without knowing the answers to these questions, a parent is "denied meaningful participation in the IEP process." *Id.* at *26. This constitutes a per se denial of FAPE. *Id.* at *27-28.

44. S.L. testified, and was supported by multiple WCS witnesses, that she did not know the curriculum that would be offered, she did not know the academic supports, she did not know the type of behavioral supports, she did not know whether there would be non-disabled peers in the therapeutic setting, she did not know the age of the students, she did not even know how far from home these placements would be, and she did not know about extracurriculars that interested J.L., like art, band, basketball, or other sports.

45. The ALJ mistakenly ruled that, in 2021, WCS's placement decision was made in "two phases." (See Final Order, p. 42). By creating a second "phase," *after* the Prior Written Notice of August 4, 2021, the ALJ found that WCS did not predetermine placement, nor did J.L.

12

lack meaningful information because she visited the placements *after* the Prior Written Notice of August 4, 2021. The ALJ then blamed the mother, S.L., for not participating in a "second phase" to determine placement. (Final Order, p. 42; see also FF ¶76, p. 16)("placement could not be determined").[15]

46. The ALJ misunderstood. There was no "second phase" for determining placement in a therapeutic setting. That placement *was* determined by August 4, 2021. The only remaining issue was *to which* facility J.L. would be removed, not *whether* he would be.

47. This is confirmed in WCS's August 5, 2021 emails to J.L[16] where WCS stated that the proposed IEP sent August 4, 2021 is the "final proposed IEP from the District" and *"[t]he IEP will go into effect"* on day-fifteen, August 19, 2021.[17] Importantly, WCS stated that a therapeutic placement already had been determined and all that remained was "to determine *which school* would be a good fit for [J.L.]."[18] Accordingly, the placement decision was pre-determined, sight unseen, without adequate parental participation.

---

[15] The ALJ also wrote that J.L.'s mother knew, or should have known, about a "therapeutic day setting" at the time of the August 4, 2021 PWN because: (1) WCS had once proposed a public elementary school, Winstead Elementary School, with additional supports; and (2) J.L. had once been placed at a private school, Robson Academy, that could be considered a "therapeutic day school." (Final Order, p. 29). Obviously, neither Winstead Elementary nor Robson Academy illustrated the curriculum, extracurriculars, ages, non-disabled peers, behavioral supports, or distance from home for entirely different schools like Genesis Academy, Rutherford Academy, or High Roads. One cannot assume that all schools are alike.

[16] This is Due Process Exhibit 12.

[17] J.L.'s mother could not visit all of them within the fourteen-day Prior Written Notice period. She visited on August 19, 20, and September 1, 2021, respectively. When she did, she discovered lack of non-disabled peers, no same age peers, and no extracurriculars like band, music, art, or even a library. That final proposed IEP stated, on page 25, that homebound instruction would be provided from August 6, 2021 to August 2, 2022 (the annual period) but, on page 26, that homebound instruction would be "for approximately three weeks."

[18] *Id.* (emphasis added).

13

## B. Second Error: Placement Without Assessment in 2021 and 2023 Amounts to Procedural and Substantive Violations

48. When it comes to the key issue of the Functional Behavior Assessment, the ALJ correctly found that, in 2021, J.L.'s mother wanted an updated FBA so that an updated Behavior Intervention Plan could be formulated. (Final Order, p 15, at ¶71). However, placement was determined on August 3, 2021, and placed in a Prior Written Notice on August 4, 2021, before such assessment could even occur.[19]

49. Generally, it takes about six weeks to perform a Functional Behavior Assessment. By 2023, Ms. Hoppe's 2021 FBA had been completed. (*Id.* at ¶107). However, Ms. Hoppe lacked sufficient data and had recommended a new one. So once again, WCS made a placement decision in 2023 "where J.L. would have no time around nondisabled peers, except for transitions." (*Id.* at ¶112)

50. The ALJ did address the "supports first" aspect of the IDEA, and particularly the *J.A. v. Smith* case, albeit after determining placement. (Final Order, p. 43). However, instead of recognizing the IDEA's *legal*-sequencing of current supports before determining placement, the ALJ sought to distinguish *J.A.* on *factual* grounds: that J.A. was young, meeting IEP goals, and no FBA had previously been conducted. (Final Order, p. 43).

51. Appropriate assessments and supports first is a *legal* condition precedent to removing a child with a disability. Only when supplemental aids and services in the regular education classroom *cannot* be achieved in regular classes can this even be done:

---

[19] WCS would try to argue that J.L.'s mother's query about "informed" consent delayed proceedings. However, that query did not occur until August 6, 2021—after placement was already determined on August 3, 2021 and PWN issued on August 4, 2021.

14

> To the maximum extent appropriate, children with disabilities, . . . [must be] educated with children who are not disabled," and separated "only when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

42 U.S.C. §1412(a)(5)(A); *L.H. v. Hamilton Cty. Dep't of Educ.,* 900 F.3d 779 (6th Cir. 2018).

52. There is no dispute that, in both 2021 and 2023, WCS believed J.L. still had behavioral needs, that its FBAs dated back to 2019 and 2020, and a BIP had not been implemented since 2019. But it *still* determined placement with zero access to *any* peers, in both 2021 and 2023.

53. That WCS is said to be "willing to conduct an FBA," (Final Order, p. 43), only underscores J.L.'s position. If that were so, WCS should stop weaponizing "prior written notice" and "stay put," and initiate the FBA in J.L.'s regular classroom setting.[20]

54. WCS committed both procedural and substantive violations. Without performing the updated assessment, it is impossible for parents, teachers, lawyers and courts to predict how, in fact, a student would perform. Courts do not know what information the FBA would yield, or consequently, how J.L. would perform with them in a particular setting. The Team is just *guessing*.

55. The case law complements 42 U.S.C. §1412(a)(5)(A) in illustrating how lack of assessments taints a placement decision both procedurally and substantively:

> [T]he failure to conduct an adequate functional behavioral assessment is a procedural violation that can have substantive effects because it may prevent the [IEP team] from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all. . . . [S]uch a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information [a functional behavioral assessment] would

---

[20] Dr. Stair, WCS's expert, removed a section of her expert report highlighting how an FBA is not transferrable from a highly restrictive setting like the home to the classroom. That is accurate, as Ms. Hoppe herself so concluded, thus the need for a new FBA.

15

have yielded and whether that information would be consistent with the student's IEP.

*Z. B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. 2018)(quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012)).

56. J.L., by all accounts, including that of the ALJ, "has no deficits academically" and his "cognitive abilities are strong." (Final Order, ¶10, p. 4). He passed every grade at WCS while having an IEP and attending full school days.

57. But he does require an updated *functional* assessment and any behavioral interventions so that the appropriate placement in his least restrictive environment (FAPE in the LRE) can be made.[21]

58. The ALJ endorsed skipping an updated FBA, and proceeding to a restrictive placement decision, in spite of the latest FBA by Ms. Hoppe stating a need for an updated FBA.

59. The failure to conduct an updated assessment prevented the IEP Team from obtaining the necessary information about J.L.'s disability. They *guessed* at it and landed on a highly restricted, shorted day, solely with a 1:1 adult, and no peers during that time.

60. As noted by J.L.'s neuropsychologist in 2019 about DMDD, frontal lobes of the brain mature and result in improved self-regulation over time. (Final Order, FF ¶49). To the extent J.L. would experience problem behaviors, it is the FBA that identifies the contributing factors in order to create plans for addressing or preventing them. Those, in turn, as even WCS agreed, affect the placement decision.

---

[21] When Ms. Hoppe conducted her Functional Behavior Assessment in December of 2021, she envisioned accommodations like breaks "*throughout the school day.*" (Ex. 30, Hoppe, p. 12 at ¶13).

## C. Third Error: J.L. did not "Waive" Stay Put

61. Finally, the ALJ erred with respect to stay put.

62. The purpose of the IDEA is to provide children with disabilities "a free appropriate public education" (FAPE), and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d). Parents who object to the hearing officer's decision may bring suit in state or federal court. 20 U.S.C. § 1415(i)(2).

63. This procedural safeguard is commonly known as the "stay put provision" and its purpose is to prohibit "state or local school authorities from unilaterally excluding disabled children from the classroom . . . during the pendency of review proceedings." *Honig v. Doe*, 484 U.S. 305, 306, 308 (1988).

64. Stay-put is the agreed-upon placement *last reached* by the parties. Thus, "a court does not define a student's educational placement when it issues a stay-put order. Instead, a 'student's current pendency placement is the educational placement in the student's last agreed-upon IEP.'" *Simpson-Vlach v. Mich. Dep't of Educ.*, 2023 U.S. App. LEXIS 11542, at *13-14 (6th Cir. May 10, 2023)(citing 20 U.S.C. § 1415(j); *N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 617-18 (6th Cir. 2014)).

65. Contrary to the law, the ALJ also found it would be "illogical" to accept that J.L.'s "stay put" is the general education placement from the last agreed upon IEP of September 5, 2019 because J.L. "was in elementary school and he has since progressed to middle school." (Final Order, p. 45).[22]

---

[22] Yet the ALJ was willing to accept an FBA and BIP that had not been used since 2019.

17

66. The ALJ found that stay put "poses an interesting issue since J.L. has not been enrolled at WCS since 2019." (Final Order, p. 45). The ALJ rejected the last agreed upon IEP from September of 2019 and ruled that J.L. "waived" stay put by attending the private Galileo school in 2022. (Final Order, p. 46).

67. Such a "waiver" did not occur, if it even *could* occur.

> [N]othing in [our cases] interprets the stay put provision as suggesting that parents can lose their stay put protection except by affirmative agreement to give it up. … In any event, even assuming that in a proper case the stay put provision can be waived, we find nothing in the record here that leads us to believe that this is such a case. Consequently, inasmuch as there was no explicit agreement by the Drinkers and Colonial that Gladwyne would not be Daniel's 'current educational placement' for purposes of the stay put provision, the Drinkers did not waive that protection.

*Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 868 (3d Cir. 1996).

68. J.L. never agreed to waive stay put. The Galileo placement occurred after WCS issued PWN for homebound and a therapeutic day school, after J.L. filed due process in 2021, and after WCS conducted a failed FBA in 2021 lacking sufficient data to determine placement. None of this is a "waiver."

69. WCS has denied J.L. a stay put placement for his protection, repeatedly refusing to conduct the necessary functional assessment *to determine* a proper placement, relying instead on non-comparable placements of homebound, therapeutic setting, and no access to non-disabled peers, both in 2021 and 2023, admittedly without an FBA or BIP to inform the decision-making process.

## IV. RELIEF

70. In the end, WCS has made overly restrictive placements (denial of a FAPE in the LRE) by (A) predetermining homebound and therapeutic placement without adequate parental

18

participation in 2021; (B) by skipping an updated FBA and behavioral interventions in 2021 and 2023, but proceeding to inappropriate and highly restrictive placements, and by (C) falsely maintaining that homebound of several hours is J.L.'s stay put placement in both 2021 and 2023.

71. Plaintiff is entitled to an IEP that provides him a Free Appropriate Public Education (FAPE) in a least restrictive environment. 20 U.S.C. §1412(a)(1)(A), §1412(a)(5)(A). "Education" is not simply academic or scholastic, but includes functional, social, emotional progress to move toward meaningful independence and self-sufficiency. *Endrew F. v. Douglas Cty. Sch. Dist. RE-I*, 137 S. Ct. 988, 999 (2017).

72. For relief under the IDEA, WCS must restore J.L. to his general education classroom *so that* a current FBA and BIP can be performed and a proper IEP constructed. Until that occurs, the continued removal of J.L. without any access to peers violates his right to FAPE in the LRE. To date, WCS has not offered an FBA in the regular education classroom or a comparable placement to his last agreed upon ("stay put") IEP of regular education on September 5, 2019.

73. WCS must also conduct an assessment of J.L. for delays to his learning ("compensatory education") given the time he has been kept out of public school since seeking his return beginning in April or May of 2021. Plaintiffs also request all attorneys' fees and costs for this action and the Due Process proceedings.

Respectfully Submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert

Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
justin@schoolandworklaw.com

19

THE SALONUS FIRM, PLC

/s Jessica F. Salonus
JESSICA F. SALONUS (28158)
139 Stonebridge Boulevard
Jackson, Tennessee 38305
Telephone: (731) 300-0970
jsalonus@salonusfirm.com

*ATTORNEYS FOR PLAINTIFFS*

CERTIFICATE OF SERVICE

A copy of the foregoing Complaint has been submitted to counsel for WCS, Ms. Deanna Arivett and Ms. Angel McCloud, at deanna@arivettlaw.com and angel@arivettlaw.com, as Plaintiffs' counsel know they are counsel of record in this matter (though they have not yet entered an appearance on the ECF system).

/s Justin S. Gilbert