UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT
OF TENNESSEE

_____

J.L., THE STUDENT, AND S.L. AND M.L.,   )
THE STUDENT'S PARENTS,                  )
     PLAINTIFFS                          )
                                        )
v.                                      )        Docket No: 3:23:cv-00516
WILLIAMSON COUNTY BOARD OF EDUC.        )        Judge Trauger
a/k/a WILLIAMSON COUNTY SCHOOLS,        )
     DEFENDANT.                          )
                                        )

_____

## PLAINTIFF'S MOTION FOR JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Plaintiff, J.L., et. al., through counsel submit this Memorandum in Support of Judgment:

### TABLE OF CONTENTS

1. INTRODUCTION……………………………………………………………………1
2. DISTRICT COURT'S STANDARD OF REVIEW OF ALJ DECISION………………………1
3. FACTS………………………………………………………………………………2
    3.1    The August 2021 IEP Meeting…………………………………………2
        3.1.1   WCS Was "Up Against the Clock"………………………………3
        3.1.2   The IEP Team Pauses the Placement Decision…………………………4
        3.1.3   WCS Refuses to Hold Another IEP Meeting………………………8
    3.2    The February 2023 IEP Meeting ………………………………………11
4. LEGAL ARGUMENT ………………………………………………………………13
    4.1    August 2021 Predetermination and Denial of Parental Participation ……………14
        4.1.1   The IEP Team Agreed to Visit and *Then* Determine Placement…............15
        4.1.2   WCS Changes the IEP Team's Plan and Refuses Another IEP Meeting…16
        4.1.3   The Harm of Indefinite Homebound ………………………………21
    4.2    February 2023: Placement Without an FBA and BIP………………………..……24
        4.2.1   WCS's Proposal Prevented a Classroom FBA……………………………26
        4.2.2   J.L.'s Proposal Permitted a Classroom FBA with Safety Measures………27
        4.2.3   FBA Determines Stamina Too…………………………………………..28
5. RELIEF…………………………………………………………………………..29

*\*\*The hearing transcripts are D.E. 16. The exhibits are contained in the certified administrative record at D.E. 16, 17, 18 and 24. The parties will cite the exhibit numbers along with the APD page number (lower left). A separate <u>uncertified</u> record, which is D.E. 19, 20, 21, and 22, should be ignored.*

## 1. INTRODUCTION

J.L. is an academically capable young man, good at art and music, and just as plainly, needs assistance managing behaviors linked to his disability. The at-issue IEP Team meetings involving his behavioral services and placement are two, occurring August of 2021 and February of 2023.

First, in August of 2021, the IEP Team was in the process of determining services and placement by visiting three Therapeutic Day Schools (TDS). Before the visits could occur, WCS said that placement in a TDS was *already* determined and, unless J.L. submitted all of his educational records for acceptances, another IEP meeting would not be held, thereby leaving J.L. on homebound status. Thus, J.L. contends WCS predetermined a TDS and denied J.L.'s parent (the whole Team actually) meaningful participation to discuss what they saw in their visits.

Second, in February of 2023, J.L. again tried to return to public school. By this time his last Functional Behavior Assessment was three years old (2020) and his last Behavior Intervention Plan was four years old (2019). J.L. contends WCS again determined a highly restrictive placement without conducting the necessary FBA, putting J.L. in a 1:1 setting that *prevented* an updated FBA.

J.L. is requesting declaratory relief, funding of an FBA, evaluation for compensatory education, training about altering IEP decisions and denying parental participation, and attorneys' fees needlessly incurred by the parents.

## 2. DISTRICT COURT'S STANDARD OF REVIEW OF ALJ DECISION

Any party aggrieved by the findings and decision made under the administrative complaint process, 20 U.S.C. § 1415(b)(6)(A), "shall have the right to bring a civil action with respect to the complaint presented" in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). The reviewing

1

Court applies a "modified de novo" standard, a preponderance standard, with "some deference to the fact findings of the administrative proceedings." *W.A. v. Clarksville/Montgomery Cnty. Sch. Sys.,* 2024 U.S. Dist. LEXIS 93311, *28-29 (M.D. Tenn. 2024)(Trauger, J.) (quoting *Somberg v. Utica Cmty. Schs*, 908 F.3d 162, 172 (6th Cir. 2018) (quoting *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004)). "More weight is due to an agency's determinations on matters for which educational expertise is relevant." *Id.* "But LRE is a *non-academic* restriction on IEPs that does not require educational expertise." *Knox Cnty. v. M.Q.*, 62 F.4th 978, 996 (6th Cir. 2024).

### 3. FACTS

J.L. has *no* academic deficits so his case turns on knowing *behavioral* services to determine an appropriate placement. The at-issue IEP meetings are August 2021 and February 2023.

### 3.1 The August 2021 IEP Meeting

Heading into the August 3, 2021 IEP meeting, J.L. had last been in a Williamson County public school as a fourth-grade student at Bethesda Elementary in the 2019-2020 school year. (Final Order, FF##13, 16). Marked by conflict, a series of placements outside of WCS followed.[1]

With strengths of reading, math, and drawing cartoon characters, J.L.'s fourth grade IEP had placed J.L. in the general education classroom most of the day, with some special education, a paraprofessional to assist his emotional/behavioral needs. (FF#16; D.E. 16, Ex. 5, APD#1345). He

---

[1]    In this series of unadjudicated placements, J.L. attended Bethesda Elementary until the school shut down for Covid-19 (FF#19); then "homebound" to settle dueling due process complaints (FF#20); followed by a series of unilateral placements by the parent (FF#22, 23, 28). "None of the intervening due process complaints, from 2019 to 2022, were adjudicated, meaning no stay put rights have been created by judicial order. J.L.'s parents and the Board have been unable to agree on revisions to J.L.'s IEP as required by statute. *See* 20 U.S.C. § 1414(d)(4)(A)." *J.L. v. Williamson Cnty.*, 2024 U.S. App. LEXIS 19406, *25-26 (6th Cir. 2024).

received special education for "emotional disturbance" due to Disruptive Mood Dysregulation Disorder (DMDD) and Attention Deficit Hyperactivity Disorder (ADHD). (FF # 16; D.E. 16, Ex. 5, , APD#1332).

Back then, fourth grade, how to mitigate J.L.'s target behaviors was a source of dispute. The last FBA at Williamson County was by Betsie Johnson in 2020. (D.E. 17, Ex. 31, APD#1562).[2] This "Johnson-FBA" revealed well-intentioned WCS staff accentuating J.L.'s negative behaviors instead of mitigating them: "Observations by the consultant raised concerns that staff are unknowingly reinforcing [J.L.'s] challenging behavior by providing an opportunity for a break or modified work (e.g., delay or escape from the original demand) following his initial noncompliance or inappropriate verbalizations." (D.E. 17, Ex. 31, APD#1564). Therefore, the Johnson-FBA had found that "an updated BIP is recommended at this time to account for the concerns listed above." (*Id.*)

### 3.1.1 WCS Was "Up Against the Clock"

Before this August 2021 IEP meeting, J.L.'s family had given ample notice of his return. On June 2, 2021, WCS completed academic and psychological testing. (FF#43). But on August 3, 2021, WCS found itself up against the school-clock: "And we were up against school was about to start and we needed to propose an IEP so that J.L. could receive service. We couldn't just wait six weeks [for an FBA] without any kind of proposal." (D.E. 16, Griego Direct Examination, APD#1027).

---

[2] The ALJ is mistaken about J.L.'s last functional behavior assessment (FBA). It was not, as the ALJ believed, dated February 26, 2019. (FF #54). That was the last FBA *written by* WCS employees. The last approved FBA conducted at WCS occurred nearly a year later, January 27, 2020, by Betsie Johnson. (D.E. 17, Ex. 31, APD#162)

The assembled IEP Team reviewed J.L.'s neuropsychology report from fourth grade where Dr. Klaver, the neuropsychologist, had advised "as J.L. gets older, the frontal lobes of his brain will mature, which will result in improved self-regulation skills." (FF #49). The Team agreed, in the August 3, 2021 IEP, that J.L.'s behaviors impede his learning or that of others. (D.E. 16, Ex. 3, August 3, 2021 IEP, APD#1273). The IEP stated that an FBA *had been* performed even though the last FBA was the Johnson-FBA from 2020. (*Id.*).

The Team agreed it needed an updated FBA, obtaining parental consent on July 30, 2021. (FF#55; D.E. 17, Ex. 36; D.E. 16, Griego, APD#1609). On that consent form, J.L.'s mother wrote: "FBA … *To address behavior needs & determine present levels of functioning.*" (D.E. 17, Ex. 36, APD#1609). Acknowledging the same, WCS agreed the FBA would "get at the heart of what the functions of his behaviors were and how we could assist." (D.E. 16, Griego, APD#915)

### 3.1.2 The IEP Team Pauses the Placement Decision

J.L.'s IEP goals were not academic but rather "Social/Emotional Behavior." (FF#65, fn. 22; D.E. 16, Ex. 3, IEP, APD#1285). Without an updated FBA to determine "how we could assist," the Team nevertheless proceeded to *discuss* placement.

WCS's special education teacher, Ms. Driver, initially proposed a 1:1 support at WCS "across all settings." (FF##58, 60; , D.E. 16, Driver, APD#222, 225; D.E. 24, Ex. 1, Audio of IEP Meeting, at 1:32:32). Staff would be trained in "crisis prevention" and student-specific behavioral trainings. (D.E. 16, Driver, APD#229). The school psychologist, Ms. Thompson, initially agreed to start at that level. (D.E. 16, Thompson, APD#724). *That plan* would have allowed the FBA to proceed and, then, a new Behavior Intervention Plan.

Unfortunately, WCS's behavioral specialist, Amanda Hare, proposed starting J.L. at a more restrictive setting—a "therapeutic day school" (TDS) removed from WCS altogether. Ms. Hare said that she feared a "quick pace" for J.L. and that J.L. would have a "hard time being removed from his peers." (D.E. 24, Ex. 1, August 3, 2021 Audio, at 1:41:00). However, the IEP already provided "pacing" accommodations in the IEP (D.E. 16, Ex. 3, IEP, APD#1286-1231) and, of course, a TDS would remove him from the *entire* school.[3]

Hare's suggestion of a TDS outside of WCS created a further dilemma for a school system already up against the clock. J.L.'s mother, and other Team members including Driver, were unfamiliar with a TDS, not knowing the number of students in a TDS, the curriculum, the type of academic and behavioral supports, whether non-disabled peers were present, the ages of the students, or how far the schools would be from her home. (FF #67-68; D.E. 16, S.L., APD Page 412-13, 417, 481). This list of unknowns made it impossible for team members to participate in a discussion without first seeing it. As even the special education teacher, Ms. Driver, would testify:

> A. No, I had never been to those.
> Q. Did you know—did you have any kind of description of the supports that those three therapeutic day schools offered as of January—excuse me, July 30, August 1, or August 6, 2021?
> A. Not specifically. I knew that they—those schools all provided behavioral supports.
> Q. Did you ever address to the team whether behavioral supports offered at any of those three paces could be delivered or could not be delivered at Williamson County schools?
> A. I don't recall.
> ....
> Q. And did you have any sense on July 30, August 3, or August 6 how much time J.L. would spend with typical peers at any of these recommended therapeutic day schools?
> A. No, I feel like that was *to be determined*.

---

[3] Prior to the IEP meeting, S.L. was wary of Ms. Hare and had asked for her removal from the team for fear she would "carry that baggage" from fourth grade when she worked with J.L. and, per S.L., was not be able to "do her duty with fidelity." (D.E. 16, S.L., APD#407)

(D.E. 16, Driver, APD#232-235).

Despite being against the clock, the IEP team chose to pause and visit three sample TDSs so that Hare's suggestion could be meaningfully considered as a Team. (FF#68). The recording of the IEP Team's facilitator, Ms. Griego, on August 3, 2021, makes this certain:

> *I would obviously want… if that is what the Team is looking at…I would want the Team to go look at those places… and mom and dad to look at those places and make those determinations with us. … What does everybody else feel about looking at a therapeutic day placement?*

(D.E. 24, Ex. 1, August 3, 2021 Audio, at 1:42:14). "Looking" meant considering *whether* a TDS might be appropriate: "*Um, what does that look like? And are they appropriate?" (Id. at 02:06:09)*. The Team would go check them out: *"So, so I think I'm hearing from, from the school part of the team is that we are saying homebound until we can check out some of these other placements." (Id. at 02:15:07)*. Then, as Ms. Driver said, the Team would "meet back together *to make determinations.*" (*Id.* at 1:57:30-1:58:01) (emphasis added).

As a placeholder placement until the next meeting, the IEP put J.L. on homebound. (D.E. 16, Ex. 3, IEP, APD#1271 ; FF#64; D.E. 16, Ex. 7, Interrogatory Ans. 7, APD#1351 (team decided "temporarily in a homebound setting."). The "LRE and General Education" page stated that homebound would be for three weeks: "homebound instruction for approximately three weeks," appropriately declining to state that a TDS had been determined. (D.E. 16, Ex. 3, IEP, APD#1271). Homebound was "*so that he's getting instruction…and receiving his IEP services while we're investigating these other options." (Id.* at 1:43:16) (emphasis added).

A day later, August 4, 2021, WCS's administration issued a Prior Written Notice (PWN) that conflicted with the IEP Team's agreement. Instead of a TDS being visited and *then* discussed at the next IEP meeting, the PWN said the Team already *determined* a TDS was necessary. (D.E.

16, Ex. 2, APD#1269). Specifically, under Section 1, WCS stated: 'The team determined that J.L. would temporarily receive homebound … **with a transition to a therapeutic setting in approximately 3 weeks** (for which another IEP meeting will need to be scheduled).'" (FF#69; D.E. 16, Ex. 2, APD#1269) (emphasis added). Under Section 2, even more pointedly, WCS stated:

> "…the team **determined** that [J.L.] required a therapeutic setting to be able to successfully transition back to a regular educational setting. **Based on the team's decision that a therapeutic placement was needed**, additional time was needed to determine which local **therapeutic schools would accept [J.L.] as a student**/contract with WCS."

(*Id.*) (emphasis added). WCS's director said in a follow up email that "[t]he IEP sent to you last night is the final proposed IEP from the district." (D.E. 16, Ex. 12, APD#1401). That IEP, beginning with homebound for three weeks, would take effect on day 15 (August 19). (*Id.*)

At the due process, J.L.'s mother pointedly testified about how, on August 3, 2021, and again on August 5, 2021, the IEP Team had *not* made a decision on whether J.L. could participate in extracurricular activities. Or that J.L. required a TDS. A TDS had not even *been seen* to know the number of students, curriculum, non-disabled peers, ages of children, or extracurriculars. The IEP Team simply had not determined any of those things, nor even updated the FBA and BIP. (D.E. 16, S.L., APD#426-428)(also attached as an Exhibit hereto)

On August 6, 2021, before visiting the TDSs, the IEP team met one more time. This was to address the still-unmet FBA and BIP. At this meeting, WCS sought to use an old FBA from Bethesda Elementary School for a new Behavior Intervention Plan. (FF#71). Having given consent for a new FBA, J.L.'s mother asked that a current FBA must be "completed first." (FF#72).

Thereafter, as the Team voted, J.L.'s mother did visit all three so-called "therapeutic" day schools: High Road Academy on August 19th or 20th, 2021; followed by Rutherford Academy; and

then Genesis Academy on August 30th and September 1, 2021. (D.E. 16, S.L., APD#432; FF #74). What J.L.'s mother saw was jarring.[4] High Roads lacked peers his age, the staff was mostly male, with a reform-school environment ("juvenile"), with no extracurriculars at all. (D.E. 16, S.L., ADP#433). Rutherford Academy was much the same and it was located next to a Knight's Inn with a bad reputation. (*Id.* at 434). Again, it did not provide for extracurriculars, with students working for food ("token economy"). (*Id.* at 434-435). Genesis Academy had no extracurriculars either and J.L.'s mother could not determine if there were peers (*Id.* at 435). J.L.'s advocate, Ms. Burkhardt, attended with J.L. and had identical concerns of no extracurriculars, filth, high-crime, and, for Rutherford Academy, no playground. (D.E. 17, Ex. 61, Offer of Proof, APD#1692 ).[5]

### 3.1.3 WCS Refuses to Hold Another IEP Meeting

After the visits, the IEP Team was *supposed* to meet again to discuss services and placement at a TDS—*whether* Hare's suggestion of beginning placement at a separate TDS was appropriate and least restrictive. But with the August 4, 2021 PWN stating the team *already* "determined" a TDS,[6] WCS's administration required J.L. to submit all his educational records to the three outside schools before it would even hold the IEP meeting to discuss placement. (D.E. 17, Ex. 51, APD#1674). *Only* if one of these three schools "would accept J.L. as a student in their program"

---

[4] WCS chose to put on no evidence about its own opinions of these schools.

[5] This was made an offer of proof for further review by this Court. It is not cumulative because Burkhardt's perception *corroborates* J.L.'s mother's testimony about these places.

[6] Again, WCS's August 4, 2021 PWN stated that a TDS had *already* been "determined" and the only matter left was "which" of three locations (brick and mortar) J.L. would go.

would WCS permit an IEP meeting. (*Id.*)[7]  Those records included *highly confidential* information that included but was not limited to neuropsychological and psychological evaluations containing details of J.L.'s medical history (D.E. 17, Ex.11, APD#1388 ; D.E. 17, Ex. 26, APD#1506).

J.L.'s mother did not agree that she must, before even discussing *whether* a TDS would be appropriate, and *whether* WCS could provide the same services, and what an FBA and BIP would show, provide highly confidential records to these outside schools. (See D.E. 16, Griego, APD#924).  So WCS refused to hold the IEP meeting, claiming that "it was stuck." (*Id.* at 799-800) ("We were stuck").  WCS left J.L. on homebound beyond the three  weeks. (*Id.*)

By October 20, 2021, J.L. remained stuck on homebound well beyond the three weeks stated in the IEP. WCS just issued another Prior Written Notice. (D.E. 17, Ex. 41, APD#1618). This one unilaterally *extended* J.L.'s homebound, without an IEP meeting, again demanding that his records must be sent to all of the schools just to receive an IEP meeting—"until the parents allowed WCS to communicate with local therapeutic schools." (FF#77; see also, D.E. 17, Ex. 41, APD#1618)("available space and were willing to accept [J.L.].")

Even though the IEP Team was supposed to discuss what they had seen, *whether* a TDS was appropriate and *whether* the services could be met by WCS, WCS claimed there was "no reason" to meet: "There is no reason to schedule an IEP meeting because the IEP team cannot consider and propose a placement that [sic] when it is unknown whether that placement will accept [J.L] into their program." (D.E. 17, Ex. 41, APD#1618 ).

---

[7] "*If any of the three schools is willing to accept [J.L.] for enrollment, the IEP would meet to consider the placement options for [J.L.]."* (*Ex. 51,* APD#1674 ) *(emphasis added); D.E. 16, Griego, APD#923-925) ("we also proposed to have an IEP meeting to consider placement at any of these that had space available and were willing to accept J.L.").

By December of 2021, with J.L. on homebound for over four months, WCS tried to complete a new FBA. But having already put J.L. on homebound, its board-certified behavior analyst, Rachel Hopp, could only consider behaviors from a "highly controlled environment" of J.L.'s home and a conference room. (D.E. 17, Ex. 30, APD#1549). A lesser controlled environment, she noted, "may evoke different responses." (*Id.* at 1548). Nor could behaviors noted in the FBA from elementary school be assumed: "[A]t this time not enough data is available to determine if the function of those behaviors is consistent with previous functional behavior assessments." (*Id.*, at 1558). Therefore, Ms. Hopp recommended "an additional functional behavior assessment should be done" if J.L. returns to a "*typical school environment.*" (*Id.* at 1560).

Contrary to the IEP Team's intention, J.L. remained on homebound. (FF#76). As a result, J.L.'s mother tried various other schools, admittedly with fits and starts: a tutor at home using WCS's curriculum; then, for three months in 2022, a new school called Galileo Prep where he could have access to peers. (D.E. 16, S.L., APD##437-438; FF #83).

Galileo Prep was unusual in that the students attended in person, but the *teachers* were remote. While Galileo offered time with peers, it did not offer any behavioral supports or mental health counseling for J.L. (D.E. 16, Oliver, APD#636). Academically, the CEO found J.L. a "very smart young man" with "so much potential," "charming," "very bright," with an advanced interest in "historical fiction novels." (*Id.* at 640). She thought he just needed mental health assistance and, if that was done, "we could help him to be successful." (*Id.* at 604).[8]

---

[8]    The ALJ recounts some positive, but mostly negative, experiences at Galileo. (FF##82-89) But again, J.L. attended Galileo without on-site teachers, and without *any* behavioral supports. His so-called "violent drawings" (FF#89) were actually "anime," a Japanese cartoon style which does involve sometimes inappropriate graphics. (D.E. 16, Oliver, APD# 646.).

### 3.2    The February 2023 IEP Meeting

In January and February of 2023, J.L. *again* sought a return to his public school at WCS. By this point, J.L. was involved in swim team, horseback riding, and drums. (FF #100).

The IEP Team created a draft IEP from February 21, 2023 to March 24, 2023. (Ex. 4, IEP, APD#1301). But the last FBA and BIP for J.L. remained those from 2019 and 2020, in elementary school, because the FBA that Hopp attempted in December of 2021 had failed for "not enough data" and its "highly controlled environment." (D.E. 17, Ex. 30, APD#1560).

WCS demanded that it be allowed to "openly" communicate directly with the last school, Galileo Prep, but *without* the mother's participation. (D.E. 17, Ex. 53, APD #1679). J.L.'s mother refused such *closed off* communication: "I think because as part of the IEP team, it's important to be involved. And due to the history as far as trust, I wanted to be privy to those conversations so that I could advocate for my son and make sure everything was accurately discussed." (D.E. 16, S.L., APD#448). Accordingly, she struck the language excluding her and signed the release. (D.E. 17, Ex. 53, APD#1679). WCS chose not to use it.

Unfortunately, operating off an elementary school FBA and BIP, WCS offered a highly restrictive non-classroom placement of a 1:1 special education teacher and paraprofessional, for half days, with no peers at all. (D.E. 16, Ex. 4, IEP, at p. 28; FF #117, APD#1328). An FBA could not reliably be completed in this non-classroom environment. Ms. Hopp unsuccessfully tried *that* back in December of 2021 in a highly controlled conference room. (D.E. 17, Ex. 30, APD#1549, 1558). The result was not transferrable to a different setting because a less controlled environment "may evoke different responses." (*Id.*, p. 1).

So, with J.L.'s advocate listening "very carefully to the concerns of the district when they are justifying [WCS's] proposal," J.L.'s mother made a much less restrictive proposal to the IEP Team, one that *would* permit a classroom FBA:

    a. All academics in supported/co-taught classrooms;
    b. 2 hours per day of direct adult support during transitions <u>between</u> classes;
    c. Because Jacob participates independently and successfully in club swimming and other activities in the community, he will <u>not</u> need special education support in non-academic classes.

(FF #121, APD#1355; D.E. 16, Ex. 8, APD##1354-55). Then, after four weeks of data gathering, the full IEP Team could review data and make any adjustments to the IEP. (D.E. 16, Ex. 8, APD#1354).

Importantly, this proposal *would* allow an FBA to be conducted in a classroom.[9] It would also permit direct adult support between classes. And WCS's supported classrooms already had trained staff in crisis prevention (D.E. 16, Driver, APD#230). During transitions from class to class, the paraprofessional could be used. (D.E. 16, Kredich, APD#372; D.E. 16, S.L., APD#458).

J.L.'s advocate, with a music degree from the New England Conservatory of Music, remembered to include his interests in art and music for extracurriculars.[10] (D.E. 16, Kredich, APD#379). With J.L. having no *academic* deficits, the general education classroom would be used for his "social/emotional and pre-vocational support" goals. (*Id.* at 382).

---

[9] This is required by Tennessee law. *S.L. v. Rutherford Cnty. Bd. of Educ.*, 2024 U.S. Dist. LEXIS 144712, *9 (M.D. Tenn. 2024) ("a new FBA was clearly required under Tenn. Comp. R. & Regs. 0520-01-09-.24(3).")

[10] (D.E. 16, Kredich, APD#345) The advocate, Ms. Kimberley Kredich, also was involved in the *L.H. v. Hamilton County* case, the *D.S. v. Knox County* case, and the *Knox County v. M.Q.* case—all involving inclusion/least restrictive environment. (*Id.* at 346)

In its Prior Written Notice, WCS stated that "IEP team consensus determined a BIP was needed" but also that it was relying on the FBA "on file" and "the BIP reviewed." (D.E. 16, Ex. 8, PWN, APD##1354, 1355; FF #122, 1355). Again, the last FBA was from 2020 and the last BIP was from 2019, now three years old. (D.E. 16, Thompson, APD#697). Ms. Hopp said that "an additional functional behavior assessment should be done" should J.L. return to school. (DE. 17, Ex. 30, APD#1560). That was the IEP Team's consensus too. (Ex. 8, PWN, APD# 1364)

Now facing a placement with *zero* access to peers, and no opportunity for the FBA in a classroom, J.L. filed for due process. This prevented that placement from becoming "stay put." And to get outside of WCS's homebound, J.L. began *homeschooling* with a combination of WCS's curriculum plus a service offering hundreds of classes with live, online teachers and access to live students. (D.E. 16, S.L., APD#459-460).[11] WCS never conducted another IEP meeting.

### 4.    LEGAL ARGUMENT

J.L.'s Due Process complaint challenged the placement decisions made in August 2021 as well as February of 2023. First, for 2021, he maintained the IEP Team was in the process of deciding a placement but WCS made an *administrative* predetermination. (D.E. 16, APD#2, ¶¶14, 17). Second, for 2023, with an FBA and BIP several years old, J.L. alleged WCS lacked current data for placing J.L. in a half day program with zero access to peers where an FBA could not be completed. (*Id.* at ¶¶9, 16).

Having exhausted these claims in an administrative due process, J.L.'s Complaint in District Court challenges the ALJ's decision for both the 2021 and 2023 placements. For 2021, J.L. alleges predetermination (D.E. 48, First Am. Complaint, ¶¶13-15, 19-20, 33). For 2023, J.L.

---

[11] "Homebound" being a few hours per week, "homeschooling" being a full educational day.

alleges WCS made a highly restrictive placement decision with zero peers, without current data from an updated Functional Behavior Assessment and a Behavior Intervention Plan. (*Id.* at ¶¶23-26, 27-30).

## 4.1 August 2021 Predetermination and Denial of Parental Participation

In the August 3, 2021 IEP meeting, WCS found itself up against the clock. That's because an IEP must be functional "at the beginning of each school year." 34 CFR 300.323(a); 20 U.S.C. §1414(d)(2)(A); *In re Special Educ. Complaint 23-157C*, 2024 Minn. App. LEXIS 530, *12 (Minn. App. July 1, 2024) (explaining how IEP must be implemented from the first day even for late summer transfers).

Not only was a new FBA needed "to get at the heart of what the functions of his behaviors were and how we could assist," (D.E. 16, Griego, APD#915), but Ms. Hare suggested the Team consider a Therapeutic Day School, unfamiliar to most on the IEP Team. Not only did this require a visit to be meaningfully discussed, *even if* a separate TDS looked promising, as Ms. Hare thought it might, the IEP Team still must ask whether those same services might be delivered in public school.

This "portability of services principle" is central to the IEP Team closing the loop on least restrictive environment. It's found in the Sixth Circuit's *Roncker* case:

> In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act.

*Roncker on behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983).

Under *Roncker,* the IEP Team asks whether the services may be brought *to the child*, rather than removing the child to a separate school. This is often expressed in a helpful idiom: "Special

14

education is not a place. It's a service." *Roncker's* portability principle remains the law today, some 41 years later: "But our inquiry must go further, asking whether the services which make [the CDC-A] placement superior could be feasibly provided in a non-segregated setting." *Knox Cnty. v. M.Q.*, 62 F.4th 978, 998 (6th Cir. 2024).

This critical principle also is found in the text of the IDEA's LRE provision itself, permitting the removal of students "only when" supplementary aids and services are unsatisfactory in the regular class:

> To the maximum extent appropriate, children with disabilities . . . are [to be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

### 4.1.1   The IEP Team Agreed to Visit and *Then* Determine Placement

One cannot discuss what one has never seen. The IEP recording and testimony clearly show the Team agreed to "look" at TDSs, "investigate" them, and *then* "meet back together to make determinations" about *whether* they "are appropriate." (D.E. 24, Ex. 1, IEP Team Audio, 1:42:14; 14:43:16; 1:57:30-1:58:01; 2:06:09; FF #67; D.E. 16, S.L., APD#412, 413, 417, 481; D.E. 16, Driver, pp. 232, 235). Consistent with that plan, the IEP draft created a placeholder of homebound without referencing a TDS. (D.E. 16, Ex. 3, IEP, p. 25, APD#1295).

The IEP Team was right. Visiting first, determining second, permits meaningful participation of the whole Team. Once the visit occurred, participants could engage about the curriculum, supports, number of students, and distance from home of a proposed placement in

order to discuss it. *D.S. by & ex rel. R.S. & E.S. v. Knox Cty.*, 2021 U.S. Dist. LEXIS 251103, at *25 (E.D. Tenn. June 21, 2021). Those are central.

After the visits, the IEP Team, including J.L.'s mother, was ready to participate and contribute. The mother's input would have included reasons that a TDS was *not appropriate* for J.L. By visiting, she had learned that none of the sample TDSs offered extracurricular activities for J.L.'s love of music and art; none had peers his age; and all appeared to be reform-schools with "token economy" strategies rather than truly being "therapeutic," one in a crime-ridden area adjacent to the Knight's Inn motel. (D.E. 16, S.L., APD##433-436).

J.L.'s parent was entitled to reasonably contribute this information. Once shared to the Team, the Team could have accepted, rejected, and certainly debated Hare's proposal of a TDS. The Team may have returned to Ms. Driver's original suggestion of using WCS, with 1:1 support trained in crisis prevention "across all settings," along with trainings specific to J.L. (FF#60; D.E. 16, Driver, APD#222, 225; D.E. 24, Ex. 1, Zoom Audio of August 3, 2021, 1:32:32). *That* suggestion would have allowed the FBA to take place and update the BIP, as everyone agreed was necessary, avoiding removal of J.L. outside of WCS.

But WCS refused to hold a meeting, thus ensuring that *no participation* occurred.

### 4.1.2   WCS Changes the IEP Team's Plan and Refuses Another IEP Meeting

One day after the August 3, 2021 IEP meeting, August 4, 2021, WCS administration changed the IEP Team's plan from "whether" a TDS to "which" TDS. It issued a Prior Written Notice stating "the team *determined* that [J.L] required a therapeutic setting…" and "additional time was needed to determine *which* local therapeutic schools would accept [J.L.] as a student/contract with WCS." (D.E. 16, Ex. 2, PWN, APD#1269). And even though the Team

had planned to visit the TDSs within *three weeks,* the PWN said these placements in the PWN would take effect in *two* weeks.[12]

There is a world of difference between determining *whether* a type of program is appropriate and *whether* the services may be ported to the public school ("let's go see it first and then we can discuss"), versus determining *which* of three brick and mortar locations J.L. would attend. Determining a type of *program* is a "placement" decision to be made solely by an IEP Team whereas a particular physical location can be done administratively. *J.W. v. Clarksville/Montgomery County Sch. Sys.*, 2015 U.S. Dist. LEXIS 199413, *14 (M.D. 2015)(citations omitted).

Consistent with the Prior Written Notice stating a TDS was already determined, WCS *refused* to hold the follow-up IEP meeting unless J.L.'s parent agreed that J.L.'s very intimate educational records be divulged to all three TDS locations. (D.E. 17, Ex. 51, D.E. 16, Griego, APD#1674). These records of course included very private medical information about J.L. having DMDD and PTSD. (e.g. D.E. 16, Ex. 3, IEP, APD#1271; D.E. 17, Ex.11, APD#1388 ; D.E. 17, Ex. 26, APD#1506). And information about harmful behaviors toward others from the past. (D.E. 16, APD#1284). *See W.A. v. Hendrick Hudson Centr. Sch. Dist.*, 2016 U.S. Dist. LEXIS 44369 (S.D.N.Y. 2016) (noting school records were "excruciatingly private and intimate in nature," and that unnecessary disclosure creates constitutional claim).

---

[12] In Tennessee, when schools plan to change a student's placement over a parent's objection, a "prior written notice" must be sent a "reasonable time" *before* the change occurs. 34 C.F.R. §300.503(a). The period until the change is fourteen days. Tenn. Comp. R. & Regs. 0520-01-09-.13; https://www.tn.gov/content/dam /tn/education/legal/Timelines_ in_Special_ Education .pdf (last visited October 22, 2024).

Holding an IEP meeting hostage to a records release is not conjecture. WCS said so: "There is no reason to schedule an IEP meeting because the IEP team cannot consider and propose a placement that [sic] when it is unknown whether that placement will accept [J.L] into their program." (D.E. 17, Ex. 41, Prior Written Notice, APD#1618).

Forced disclosure of J.L.'s highly confidential records involving DMDD and behaviors to three locations was premature at best. Again, the Team was supposed to be determining *whether* a TDS was appropriate and *whether* any desirable services could be provided within WCS. In that follow-up meeting, if the Team decided that a TDS was not appropriate, there would be no need to issue very intimate educational records to these entities. And if the IEP Team thought it *was* appropriate, J.L.'s family could resist these schools by privately placing at their own cost.

Under both FERPA and the IDEA, the educational records of a student may be shared with an outside private school when "the student seeks or intends to enroll, upon condition that the student's parents be notified of the transfer, receive a copy of the record if desired, and have an opportunity for a hearing to challenge the content of the record." 20 U.S.C. §1232g (FERPA); 34 C.F.R. §300.622 (IDEA). But the Team had made no such decision. The PWN of August 4, 2021, stating that it *had* occurred, was contrary to the IEP Team. Fortunately, the meeting was recorded.

Even though WCS refused to hold the follow-up meeting, the ALJ plunged forward and determined that a non-discussed therapeutic placement *was* appropriate. (Final Order, p. 37). Conceding the IEP Team never discussed it, the ALJ wrongly pinned that blame on the parent for failing to participate. (*Id*. at 42). To the contrary, J.L.'s parent and IEP team members executed the "process" precisely by visiting all three locations. WCS obstructed the next meeting by insisting on prematurely divulging highly confidential records to three locations. Again, J.L. was

not seeking or intending to enroll, but to discuss what she saw as *serious problems* with offerings of High Roads Academy, Genesis Academy, or Rutherford Academy. Moreover, the Team did not know what an updated FBA would show, with the last BIP showing WCS staff unwittingly reinforcing negative behaviors. (D.E. 17, Ex. 31, APD#1564)

Under the IDEA, rather obviously, *the IEP Team* must meet to change placement. The only exception is where a parent consents in writing to not having an IEP Team meeting:

> In making changes to a child's IEP after the annual IEP Team meeting for a school year, the parent of a child with a disability and the public agency may agree not to convene an IEP Team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP.

34 C.F.R. §300.324(a)(4)(i). Such agreement never occurred.

Cases illustrate how the IEP Team's decision-making is what matters. In *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189 (9th Cir. 2017), the Team proposed to the parent an IEP with 240 minutes "per month" of services. *Id.* at 1195, 1197. At the due process hearing, the school district argued that "per month" *should have been* "per week" and that it made that change to the IEP the week after the IEP meeting. *Id.* Even though this benefited the child, the parent was put to great expense because a "unilateral amendment is a per se procedural violation of the IDEA because it vitiates the parents' right to participate at every step of the IEP drafting process." *Id.* at 1197.

In *Spring Branch Indep. Sch. Dist. v. O.W.*, 961 F.3d 781 (5th Cir. 2020), school officials decided to shorten the student's school day without an IEP Team meeting. *Id.* at 798. This violated the IDEA too: "Unless the IEP is modified by agreement in accordance with paragraph (a)(4), it may be modified only by the entire IEP Team at an IEP Team meeting." *Spring Branch Indep. Sch. Dist. v. O.W.*, 961 F.3d 781, 798-799 (5th Cir. 2020) (citing 34 C.F.R.§ 300.324(a)(6)).

19

In the present case, on August 3, 2021, the IEP team was on track to ensure they understood what a TDS program would look like: "what classroom [the child] would be in, how many transitions [the child] would have to undertake, how many students would be in the class, and what disabilities those students would have." *D.S. by & ex rel. R.S. & E.S. v. Knox Cty.*, 2021 U.S. Dist. LEXIS 251103, at *25 (E.D. Tenn. June 21, 2021). *That's* meaningful participation, a discussion among valuable Team members:

> A team of people work cooperatively to formulate the IEP. This 'IEP team' comprises the student's parents or guardian, a school district representative, the student's regular and special education teachers, a person able to interpret the student's results and evaluations, and, when appropriate, the student. § 1414(d)(1)(B).

*L.H. v. Hamilton Cty. Dep't of Educ.,* 900 F.3d 779, 788 (6th Cir. 2018)

But on August 4, 2021, by deciding upon a TDS *administratively*, issuing a legally binding PWN, and then refusing to hold another IEP meeting unless J.L. could be enrolled in a specific TDS, WCS first predetermined and then preempted parental participation. The IEP Team never met after the visits. Such procedural violations inherently trigger substantive harms under the IDEA. *D.S.,* 2021 U.S. Dist. LEXIS 251103, at *25-28 ("While procedural in nature, denial of meaningful parental participation is a per se denial of a FAPE.")

The ALJ would distinguish *D.S. v. Knox County* on the grounds that J.L.'s mother was allowed to visit the schools. (Final Order, p. 42). Yes, she was. But the TDS placement decision was made in the August 4, 2021 PWN *before* she visited. "After the fact involvement is not enough." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) (citing *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 259 (4th Cir. 1988); *accord, J.A. v. Smith Cty. Sch. Dist.*, 364 F. Supp. 3d 813, 832 (M.D. 2018). And, just as importantly, after she visited and was

ready to participate, WCS refused another IEP meeting—unless J.L. divulged records and could

enroll in *those schools*.

The IDEA is *not* supposed to function in this manner. Even without a full administrative

record, the Sixth Circuit observed this case has gone awry:

> The IDEA is not supposed to function this way. Federal regulations enforcing that statute give clear directives to ensure a child's placement remains current. Relevant here, the school "must ensure" that the child's placement is determined at least annually and based on an IEP. *See* 34 C.F.R. § 300.116(b)(1)-(2). The Board in this case has failed to meet that obligation; J.L. has not had a placement since, at the very latest, 2020. Nor has he had a functioning IEP since December 2019—another unmet IDEA mandate. *See* 20 U.S.C. § 1414(d)(2)(A). But fault does not lie entirely with the Board. Federal regulations also require "the parents" to play a role in the "placement decision." *Id.* § 300.116(a)(1). Thus, both school and parent have a legal obligation to establish the child's IEP.

*J.L. v. Williamson Cnty.*, 2024 U.S. App. LEXIS 19406, *26 (6th Cir. 2024).

### 4.1.3  The Harm of Indefinite Homebound

As shown above, predetermination and denial of meaningful participation constitute *per se*

substantive harm. Beyond that, being left on indefinite homebound is an actual substantive harm

which, in this case, forced J.L. into fits and starts of other placements to get an education.

The IDEA does not permit homebound as a penalty, a stop-gap, a research tool,[13] or

placeholder until a future event occurs.[14] Rather, homebound is a placement on the spectrum of

---

[13] Absent parental agreement, there is no exception for a homebound placement on grounds that it is "transitional," observant, a trial placement, an interim IEP, a grace period, an eased-entry, a holding tank, a placement for diagnostic purposes, or what the school *thinks* is a good idea at the start of school because it is "up against the start of school."

[14]  Some states do recognize a "trial placement *for diagnostic purposes,*" which is different than creating an IEP placement. Regs, Conn. State Agencies, §10-76d-14 ("Trial Placement for Diagnostic Purposes"). "A trial placement for diagnostic purposes is an evaluation and shall not be the current educational placement of a child for purposes of determining the child′s status during

placements used when the child cannot receive an educational benefit *"in a less restrictive setting."* Tenn. Reg. 0520-01-09-.07(2). It is reserved for students who are medically *unable* to attend school and it requires certification by physicians. Tenn. Code Ann. §49-10-1101.[15] It is *not* a penalty for parents refusing to divulge highly sensitive mental health information to outside providers.

The tell-tale sign of a misguided IEP is a placement that is not based upon the actual IEP goals and services. The first goal of the proposed August 2021 IEP refers to what J.L. will do "if he does not understand a *classroom* task or directive…." (D.E. 17, Ex. 3, IEP, Goal 1, p. 15, APD#1285). The second goal involves how J.L. will respond to the "*classroom* task, activity, and/or assignment without engaging in target behavior…." (*Id.* at Goal 2). All of the goals are to involve "Student Support Staff, *General Education Teacher*, Student." (*Id.* at pp. 15-16). This illustrates how WCS could not implement the actual IEP goals through homebound instruction.

By leaving J.L. on homebound, WCS ensured that an updated FBA within WCS was impossible. When Ms. Hopp attempted it—after-the-fact in December of 2021—J.L. lacked a classroom to perform it. As a result, the FBA was performed in J.L.'s home and a WCS conference room, a "highly controlled environment" whereas a different environment "may evoke different responses." (D.E. 17, Ex. 30, APD#1549,1558).

As WCS's psychological expert acknowledged, having the right supports in place "can *determine* an appropriate and least restrictive placement." (D.E. 16, Stair, APD#845) (emphasis added). Those would certainly include behavioral supports. (*Id.*). For a child with DMMD,

---

due process proceedings in accordance with 20 USC 1415(j)." *Id.* But Tennessee has no such regulation, nor was WCS seeking a diagnostic placement, nor an exception from stay-put rules.

[15] There is no such certification in this case.

behavioral supports are "very relevant." (*Id*. at 846). In fact, "we absolutely have to know what the child's triggers are to try to prevent them in a classroom setting." (*Id*.) And the way to find out is through an FBA. (*Id*.)

Having left J.L. on homebound, the IEP could not be implemented, certainly not with any behavioral services. And behavioral deficits, not academic deficits, are the reason J.L. has an IEP in the first place.

## 4.2 February 2023: Placement Without an Updated FBA and BIP

Following desperate attempts to educate J.L., admittedly fits and starts, J.L.'s parent tried to return him to WCS in 2023. In the First Amended Complaint, J.L. alleges WCS made a highly restrictive placement decision with zero peers, *again* without current data from an updated Functional Behavior Assessment and a Behavior Intervention Plan. (D.E. 48, First Am. Complaint, ¶¶23-26, 27-30) (with record citations).

As defined under the IDEA, "a FAPE comprises 'special education and related services'— both 'instruction' tailored to meet a child's 'unique needs' and sufficient '*supportive services*' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017) (quoting 20 USCA § 1401) (emphasis added).

For students like J.L. with behavioral needs, the IDEA includes "other supportive services . . . as may be required to assist a child with a disability to benefit from special education[.]" 20 U.S.C. § 1401(26); 34 C.F.R. § 300.34(a). "Counseling services" may be provided through social workers, psychologists, guidance counselors, or other qualified personnel. 34 C.F.R. §300.34(c)(2). Additionally, "parent counseling and training" is available, id. at §300.34(c)(8)(i)-

(iii), as well as "school health services," *id.* at §300.34(c)(13), and "social work services" to include "group and individual counseling with the child and family." *Id.* at §300.34(c)(10),(14).

"Where a student's behavioral problems are impeding [his or her] ability to learn, and the school district fails to address those problems in an appropriate way, such a failure may constitute a denial of FAPE." *R.B. v. Downingtown Area Sch. Dist.*, 509 F.Supp.3d 339, 347 (E.D. Pa. 2020).

WCS's IEP said the FBA was already completed. (D.E. 16, Ex. 4, IEP, APD#1303). Refusing to provide or, in this case update, behavioral supports, believing they are "futile or useless in light of his disability," is impermissible, "the type of approach that the IDEA was designed to remedy, not encourage or protect." *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 795 (6th Cir. 2018); *M.Q.*, 62 F.4th at 992.

For students whose IEP deficits *are* behavioral, not academic, the behavioral goals and supports are what matters to the whole IEP-building process:

> [T]he failure to conduct an adequate functional behavioral assessment is a procedural violation that can have substantive effects because it may prevent the [IEP team] from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all. . . . [S]uch a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information [a functional behavioral assessment] would have yielded and whether that information would be consistent with the student's IEP.

*Z. B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. 2018)(citation omitted).

In *J.A. v. Smith Cty. Sch. Dist.*, 364 F. Supp. 3d 813 (M.D. Tenn. 2018), Magistrate Judge Brown reversed the ALJ for ordering a specific placement and *then* instructing an FBA and BIP be conducted. "[T]he Magistrate Judge concludes that the ALJ erred in ordering an FBA be conducted and for placement to be determined for the following school year *after* first finding that placement at CES was a reasonable alternative." *Id.* at 834-35.

More recently, in the Third Circuit, a case with similar facts appeared. *Upper Darby Sch.*
*Dist. v. K.W.*, 2024 U.S. App. LEXIS 20582 (3d Cir. 2024). In *Upper Darby*, a student in the 2020-
21 and 2021-22 school years "was often frustrated, yelling, or running around the classroom" and
consistently "required de-escalation." *Id.* at *2. The student needed a Positive Behavior Support
Plan (PBSP) based on a Functional Behavioral Assessment (FBA). *Id.* at *3. By having such a plan,
the district would "collect behavioral data and develop strategies to address behavioral problems
in a systematic and consistent way." *Id.* at *2. Even though "K.W. suffered from significant
behavioral problems that inhibited his ability to learn, and … he would benefit from a PBSP," it
was not conducted. *Id.* at *6. This failure denied the student an appropriate education. *Id.*

Tennessee is no different. By February of 2023, Tennessee made it plain that an FBA to
inform a Behavior Intervention Plan is required in certain situations. "An FBA shall be conducted
to inform the development or revision of a Behavior Intervention Plan in any of the following
situations:

> (a) When a student receiving Special Education and Related Services engages in
> conduct that results in a change of placement as defined by 34 C.F.R. 300.536 and
> the LEA, the Parent, and relevant members of the IEP team determine that the
> student's conduct that gave rise to the change in placement was a manifestation of
> the child's disability;
>
> (b) When an IEP provides for the use of restraint or isolation, as required by T.C.A.
> 49-10-1304(b);
>
> (c) When the student exhibits a pattern of behaviors that impede their learning or
> that of others;
>
> (d) When the student exhibits a pattern of behavior that places the student or others
> at risk of harm or injury;
>
> (e) When the student's IEP team is considering a more restrictive placement as a
> result of the student's behavior; or

(f) When determined appropriate by the student's IEP team."

*S.L. v. Rutherford Cnty. Bd. of Educ.*, 2024 U.S. Dist. LEXIS 144712, *9 (M.D. Tenn. 2024) ("a new FBA was clearly required under Tenn. Comp. R. & Regs. 0520-01-09-.24(3)").

### 4.2.1. WCS's IEP Proposal Prevented a Classroom FBA

In 2023, the IEP Team agreed upon an IEP with four goals and a thorough, lengthy list of accommodations that included "pacing," non-verbal cues for a break, frequent breaks, structured choices, redirection for negative emotions, a designated break space, and praise and "upbeat" teaching. (D.E. 16, Ex. 4, APD##1315-1316). But the placement proposed by WCS was not a classroom but a 1:1 arrangement, with no peers, and only for half days. (*Id.* at p. 1328).

Just like the 2021 IEP, the 2023 IEP stated that WCS had performed a Functional Behavior Assessment and a Behavior Intervention Plan to "address[] the student's behavior." (D.E. 16, Ex. 4, IEP, APD#1303). Once again, that was not accurate. By this point, the BIP dated back to 2019 and the last FBA, the Johnson-FBA, to 2020.

Clearly, Tenn. Comp. R. & Regs. 0520-01-09-.24(3), WCS believed J.L. had a pattern of behaviors that impede his learning, (category (c)). Its draft IEP said so. (D.E. 16, Ex. 4, IEP, APD#1303) ("Does the student's behavior impede his learning or that of others?" with the answer, "Yes."). Again, it falsely implied the FBA had been performed. (*Id.*). Additionally, WCS felt J.L.'s behaviors would place him or others at risk (category (d)). (D.E. 16, Ex. 4, APD#1310) And finally, the IEP team was considering a more restrictive placement than either regular education or the proposal made by J.L. and her advocate (category (e)). (*Id.* at APD#1328).

Claiming the FBA and BIP already existed from elementary school, (D.E. 16, Ex. 4, IEP, APD#1303), WCS created a placement where classroom triggers could not be observed. In a 1:1

26

space for half days, J.L. would remain in highly contained space.[16] Hopp already said that less "controlled" environments "may evoke different responses." (D.E. 17, Ex. 30, APD#1548). Classrooms are full of students, distractions, a different teaching style, and different behavioral triggers. For this reason, Hopp recommended an FBA be done when he returns to a "typical school environment." (*Id.* at 1560). Had J.L.'s parent accepted half-day placements with zero peers, that acceptance would amount to a "stay put" under 20 U.S.C. § 1415(j).[17]

### 4.2.2. J.L.'s IEP Proposal Permitted a Classroom FBA With Safety Measures

In contrast to WCS's Proposal, J.L.'s proposal to the IEP Team would have returned J.L. to a classroom with peers allowing the FBA to proceed as Hopp said it should be. (D.E. 17, Ex. 30, APD#1560) (recommending "an additional functional behavior assessment should be done" once J.L. returns to a "typical school environment."). As the Johnson-FBA from 2020 stated, J.L.'s behaviors might be mitigated as simply as teachers not reinforcing poor behavior inadvertently. Or maybe that is *part* of the solution. The point is that it is impossible to know until a scientific FBA analyzes the antecedents to J.L.'s behaviors.

The ALJ relied on Dr. Stair, a school psychologist from Knox County, who "liked" the "short-term placement." (FF. #137). WCS did not offer Dr. Stair as an expert in how LRE

---

[16]    "[I]t is illusory, and perhaps even pretextual, to contend that segregation can breed readiness for inclusion." *Oberti v. Board of Educ. of Clementon School Dist.*, 789 F. Supp. 1322, 1335 (D. N.J. 1992).

[17]    And J.L.'s parent knows from experience that WCS is capable of arguing extreme stay put placements—homebound for *years*. (D.E. 8, Response to Stay Put Motion, p. 7 ("homebound is J.L.'s stay-put placement.")

operates or LRE placements for J.L., or even stay put, but rather only for diagnoses of mental health disabilities, psychological assessments, and eligibility. (D.E. 16, Stair, APD#810).

Regardless of what Dr. Stair "liked," an updated FBA and BIP was *required by law*, not an IEP-placement where an FBA with peer-triggers could not occur. When pressed on cross-examination, Dr. Stair agrees that having the right supports in place "can *determine* an appropriate and least restrictive placement." (*Id.* at APD#845)(emphasis added). For a child with DMMD, like J.L., behavioral supports are "very relevant." (*Id.* at 846) In fact, Dr. Stair agrees "we absolutely have to know what the child's triggers are to try to prevent them in a classroom setting." (*Id.*) And the way to find out is through an FBA. (*Id.*). An FBA is not necessarily transferrable from one setting to another because, for example, triggers at home are different than a classroom. (*Id.* at 877)

### 4.2.3 FBA Determines Stamina Too

WCS had no *data* suggesting that J.L., a smart student without any *physical* ailment, could only tolerate half days. Galileo Prep, in person *with* remote teachers, was not half days. Yet WCBE refused to use the release signed by J.L.'s mother permitting her to be involved in discussions with Galileo Prep. (D.E. 17, Ex. 53, APD#1679)

Even if such data existed that J.L. required half days, an FBA still would be the device to address what services, put into a BIP, enable full day participation. *J.N. v. Or. Dep't of Educ.*, 338 F.R.D. 256, 263 (D. Or. 2021) (citing 20 U.S.C. §§ 1415(k)(1)(D)(ii), (F)(emphasis added)). By putting J.L. on half days without a classroom, and no FBA, the parties would not gather meaningful classroom data on stamina with peers. And J.L. would have no enjoyment of extracurricular activities which involve peers such as band and art. An appropriate education allows the student

"to participate in extracurricular and other nonacademic activities." 20 U.S.C. §1414(d)(1)(A)(i)(IV)(bb); 34 C.F.R. §300.107. A *lack* of extracurriculars is part of LRE too. 34 C.F.R. §107(b); *see also* 34 C.F.R. §300.42 (special education aids and services "must ensure that each child with a disability participates with nondisabled children in the *extracurricular services* and activities to the maximum extent appropriate to the needs of that child.").

WCS demanded a highly restrictive environment where an FBA could not be completed. At the end of four weeks, the parties would be right back where they started: a placement decision requiring an updated FBA and BIP to understand both classroom triggers and, if they still exist, how WCS must not reinforce them.

## 5. Relief

Tailoring equitable relief for the harms in August of 2021 and February of 2023 requires some creativity. With no stay put at all for an academically bright child needing extracurriculars and peers, the family enrolled J.L. in a public school in Alabama for this year. (D.E. 50) (citing *E.D. v. Newburyport Pub. Sch.*, 654 F.3d 140, 143 (1st Cir. 2011) (then-Judge Souter) ("the Does had to take some action to ensure that their boy would have an appropriate place to go when the school year began.").

"[O]nce a court holds that the public placement violated [the] IDEA, it is authorized to grant such relief as the court determines is appropriate." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 15-16 (1993).[18] The IDEA is based largely on equitable principles. A court "shall grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii);

---

[18] As this Court knows from the case management conference, to avoid losing another school year to litigation, the family relocated J.L. to Alabama where he attends public school.

"equitable considerations are relevant in fashioning relief," *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985); "and the court enjoys 'broad discretion' in so doing." *Florence Cnty.*, 510 U.S. at 16 (quoting *Burlington*, 471 U.S. at 369); *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 453 (2d Cir. 2014) (A "broad spectrum of equitable relief [is] contemplated under the IDEA."). Plaintiff makes the following suggestions for equitable relief.

First, *declarative* relief of the violations of IDEA is appropriate in this case. *K.I. v. Montgomery Pub. Sch.,* 805 F. Supp. 2d 1283, 1299 (M.D. Ala. 2011) (" The Court will include a declaration in the final judgment that MPS violated K.I.'s right to a FAPE by failing to comprehensively evaluate her and develop an adequate IEP"); *Jones v. District of Columbia*, 2019 U.S. Dist. LEXIS 21906, *9, 2019 WL 532671 (D.D.C. 2019) (declarative relief for violating IDEA).

Second, WCS should be required to fund a functional behavior assessment at J.L.'s current school (where he *finally* has a classroom) or at WCS should he return upon a decision. This is appropriate in cases where the school did not perform the correct assessment or behavior plan in the first instance or created an update without an analysis of the behaviors. *L.M. v. Henry County Bd. of Educ.*, 2020 U.S. Dist. LEXIS 118276, *8 (E.D. Ky 2020). If the student has obtained a new school, as J.L. has, the remedy may be delivered "if the student chooses to return" to the offending school. *Id*. at *5. ("Defendant is only required to conduct a new FBA if L.M. chooses to return to Henry County Schools.").

Third, because IDEA review is so "ponderous,"[19] the harm from 2021 and 2023 is years from a judgment. Therefore, courts are called upon to be "versatile" with compensatory education. *See e.g., Stapleton v. Penns Valley Area Sch. Dist.*, 2016 U.S. Dist. LEXIS 71121, *23 (M.D. Pa. 2016) (compensatory award for use in college given delays and child's age). Instead of assuming an uncertain impact, Plaintiff requests WCS fund an independent evaluation to determine any educational loss due to the violations in 2021 and 2023. See *E.P. v. Twin Valley Sch. Dist.*, 517 F. Supp. 3d 347, 366 (E.D. Pa 2021) (using "an independent evaluator to decide how much compensatory education will put [student] in the place he would have been in had the school district consistently met its obligations in the first place is fair and equitable.").

Fourth, ordering WCS training about how WCS must not, through a prior written notice, alter the IEP Team's determination is proper. *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006) (educator training is an acceptable form of relief).

Fifth, but very importantly to the family, the family has expended attorneys' fees that would have been used for J.L.'s college. By refusing to conduct an IEP meeting unless he agreed to enroll in one of three "therapeutic" day schools in 2021, and by creating a highly restrictive placement without an FBA in 2023, J.L.'s family incurred unnecessary legal fees. "Incurring unnecessary legal fees is, of course, a form of prejudice that denies a student and his parents an educational benefit." *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1198 (9th Cir. 2017). Hence, an award of reasonable attorney's fees is likewise appropriate in this case.

---

[19] "A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by the IEP has passed." *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985).

These type of remedies are all consistent with the IDEA's "flexible approach" to relief and warranted in this instance. *W.A. v. Clarksville/Montgomery Cnty. Sch. Sys.,* 2024 U.S. Dist. LEXIS 93311, *43 (M.D. Tenn. 2024) (Trauger, J.) (citations omitted). For these reasons, J.L. prays for reversal of the ALJ's decision.

Respectfully submitted,

**GILBERT LAW, PLC**                              **THE SALONUS FIRM, PLC**

/s Justin S. Gilbert                                        /s Jessica F. Salonus
JUSTIN S. GILBERT (017079)                     JESSICA F. SALONS (28158)
100 W. Martin Luther King Blvd, Suite 501   139 Stonebridge Blvd
Chattanooga, TN 37402                               Jackson, TN 38305
Telephone: 423.756.8203                             Telephone: (731)3--=0097
justin@schoolandworklaw.com                   jsalonus@salonusfirm.com

*ATTORNEYS FOR PLAINTIFFS*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a true and correct copy of the foregoing Motion/Memorandum in Support of Judgment has been filed via the Court's electronic filing system (ECF) and with notice provided to Defendant's counsel Ms. Deanna Arivett and Ms. Angel McCloud on November 8, 2024 at the following contact information:

Arivett Law, PLLC
567 Cason Lane, Suite A
Murfreesboro, TN 37128
615-987-6006
Email: deanna@arivettlaw.com
Email: angel@arivettlaw.com

/s Justin S. Gilbert