# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **J.L., a student, and S.L. and M.L., his parents,** | ) ) ) | **Case No. 3:23-cv-00516** |
| **Plaintiffs,** | ) ) ) | **Judge Aleta A. Trauger** |
| **v.** | ) ) | |
| **WILLIAMSON COUNTY BOARD OF EDUCATION,** | ) ) ) | |
| **Defendant.** | ) ) | |

## MEMORANDUM

The plaintiffs appeal the decision of an administrative law judge regarding claims they brought under the Individuals with Disabilities Education Act ("IDEA"). The plaintiffs have filed a Motion for Judgment and Supporting Memorandum of Law (Doc. No. 53), to which the Williamson County Board of Education ("WCBOE") has filed a Response (Doc. No. 54), and the plaintiffs have filed a Reply (Doc. No. 55). For the reasons set forth herein, the motion will be denied.

## I.    FACTUAL BACKGROUND

J.L., a high school freshman and varsity swimmer, was born in 2010 and is almost fifteen years old. S.L. and M.L. are his parents. J.L. has strong cognitive abilities and is bright, creative, and articulate. (*See* Doc. No. 16 at 1276, Aug. 3, 2021 Draft Individual Education Program ("IEP")

at 2[1].) In the assessment of Dr. Wendy Oliver, Chief Education Officer of Galileo Academy—which J.L. briefly attended—and uncontroverted by the record, J.L. "has so much potential," is "very smart," and "can be so charming." (Doc. No. 16 at 643–44, Oliver Tr.[2]) J.L. also rides horses and plays the drums and piano. (Doc. No. 16 at 1241, Final Order at 21 ¶ 100[3]; Aug. 3, 2021 Draft IEP at 2.) According to the plaintiffs, J.L. resides with his parents in Spring Hill, Tennessee in Williamson County and is enrolled at "a public school in Alabama for this [school] year."[4] (Doc. No. 48 ¶ 1; Doc. No. 53 at 29; Doc. No. 50 at 1 & n.1.)

At the same time, because J.L. has received diagnoses of Disruptive Mood Dysregulation Disorder (DMDD) and Attention Deficit Hyperactivity Disorder (ADHD), he qualifies for special education services under the classification of "emotional disturbance."[5] "DMDD is characterized

---

[1] The court will refer to J.L.'s August 3, 2021 Draft IEP by its original pagination rather than that assigned by the court's electronic filing system. The August 3, 2021 Draft IEP can be found in the record. (Doc. No. 16 at 1275–1381.)

[2] The record before the court includes the "Trial Transcript" of J.L.'s due process hearing—described in greater detail below—before Administrative Judge Rachel Waterhouse, which took place on May 2, 3, and 5, 2023. The Transcript can be found in the record. (Doc. 16 at 123–1073.)

[3] The court will refer to the Final Order that resulted from J.L.'s underlying due process complaint by its original pagination rather than that assigned by this court's electronic filing system. The Final Order can be found in the record. (Doc. No. 16 at 1221–1268.)

[4] The defendant denies that J.L. resides in Spring Hill, Tennessee. (Doc. No. 52 at 1 ¶ 1.) The parties do not further discuss where J.L. resides, with whom, whether his family has relocated to Alabama, or, if J.L. does reside in Tennessee, how he is enrolled in an Alabama public school. In any case, the plaintiffs would like J.L. to reenroll in Williamson County Schools ("WCS") (Doc. No. 50 at 2), and their demand for compensatory education (Doc. No. 48 ¶ 40) quells mootness concerns. *Accord J.M. by & Through Mata v. Tenn. Dep't of Educ.*, 358 F. Supp. 3d 736, 749 (M.D. Tenn. 2018) (stating, "if a student is denied a FAPE in a way that has hindered his progress in certain subject areas, a court may order specific compensatory educational services in an attempt to catch him up," and collecting cases).

[5] J.L. has also been diagnosed with Post-Traumatic Stress Disorder (PTSD), Generalized Anxiety Disorder, and Specific Learning Disorder with impairment in written expression. (Final Order at 3 ¶ 4; August 3, 2021 Draft IEP at 1.) Earlier diagnoses include Oppositional Defiant Disorder and rejection-sensitive dysphoria. (Doc. No. 17 at 12, Klaver Neuropsychological Report (July 12, 2019).) As of 2023, he is also eligible for special education services under the

2

by severe and recurrent temper outbursts . . . that are grossly out of proportion in intensity or duration to the situation. The key feature of DMDD is chronic irritability . . . between . . . tantrums." (Doc. No. 17 at 16, Klaver Neuropsychological Report at 6 (July 12, 2019).) In J.L.'s case, his educational disability under emotional disturbance "presents as difficulties with impulse control, low frustration tolerance, and decreased self-regulation." (Aug. 3, 2021 Draft IEP at 2.) He has "displayed heightened externalizing behaviors such as verbal outbursts, physical aggression, and elopement." (*Id.*) J.L. "escalates very quickly to verbal and physical aggression (e.g., cursing, pinching, slamming his fists, or harming others)." (Doc. No. 17 at 12, Klaver Neuropsychological Report at 2 (July 12, 2019).) He has stabbed a school employee with a pencil and twice threatened to kill his father with a knife. (*Id.*; Final Order at 4 n.7.) As Administrative Law Judge Rachel Waterhouse summed it up: "[t]hroughout the years, J.L.'s behaviors have included: physical aggression, hitting, kicking, throwing objects towards another individual, causing or threatening harm, breaking pencils, punching books, slapping tables, elopement from classrooms and school buildings, noncompliance, arguing, verbal outbursts, ripping or crumpling up worksheets, yelling above the expected volume for settings, using inappropriate language, cursing, calling people names, suicidal comments, and negative self-talk." (Final Order at 3–4 ¶ 6.)[6]

J.L. spent his early childhood years in several Williamson County Schools ("WCS")— most-recently as a fourth grader at Bethesda Elementary during the 2019–2020 school year. (Doc. No. 5-5, WCS's Due Process Hearing Complaint and Request for Expedited Due Process Hearing at 2 ¶¶ 3–5 (Mar. 6, 2020).) There, he attended both general and special education classes and

---

classification "other health impairment." (Final Order at 4 n.8; Doc. No. 16 at 1306, Feb. 7, 2023 Draft IEP at 2.) J.L.'s eligibility for special education services is not disputed.

[6] The plaintiffs note, in their original Complaint, that "J.L. did have a history of episodes of aggression, hitting, running, and verbal outbursts at both home and school." (Doc. No. 1 ¶ 17 (citing Final Order at 3–4 ¶ 6).)

3

received various special education and related services pursuant to an IEP and behavior intervention plan based upon a functional behavior assessment ("FBA"). (Doc. No. 16 at 1336, 1338, 1349–50, Sept. 5–Dec. 3, 2019 IEP.) Early in the 2019–2020 school year, however, a dispute arose between J.L.'s parents and the rest of his IEP team regarding whether placement at Bethesda could continue, in light of J.L.'s sometimes-violent outbursts. (*See* Doc. 5-5 at 3 ¶¶ 19–25 (noting various incidents of physical and verbal aggression and elopement).) School officials on the IEP Team proposed that J.L. attend the district's Winstead Elementary, which had a "Tier 3 supported classroom,"[7] to better address his "social/emotional behavior needs." (Doc. No. 17 at 49, Oct. 19, 2019 Draft IEP.) J.L. disputed the proposed placement and filed a due process complaint. (Doc. No. 5-4.) As the plaintiffs put it, "[m]arked by conflict, a series of placements outside of WCS followed." (Doc. No. 53 at 2 & n.1 (citing Final Order at 6 ¶¶ 22, 23, 28.)

Under the IDEA's "stay-put" provision,[8] during the pendency of J.L.'s due process complaint, he remained at Bethesda. In early 2020, because of J.L.'s continued behavioral issues, WCBOE filed its own due process complaint seeking a "*Honig* injunction," which allows an exception to stay put rights to remove children who pose safety risks.[9] (Doc. No.

---

[7] "A WCS Tier 3 therapeutic program is for students who have documented social/emotional needs for exhibited behaviors at such an intense level that they are provided with a higher level of support than can be provided in a traditional school setting." (Final Order at 14 n.9.)

[8] Because a child's education cannot be paused during litigation, the IDEA includes what has become known as a "stay-put" provision, which requires that, "during the pendency of any proceedings initiated under the Act, unless the state or local educational agency and the parents or guardian of a disabled child otherwise agree, 'the child shall remain in the then current educational placement.'" *Honig v. Doe*, 484 U.S. 305, 323 (1988) (quoting the provision now at 20 U.S.C. § 1415(j)) (emphasis omitted); *see also* 34 C.F.R. § 300.518.

[9] *See Honig*, 484 U.S. at 328 (reading the IDEA to permit school officials to secure an exception to the stay-put provision "by showing that maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or to others").

4

5-5.) But whether WCBOE was entitled to an injunction was never resolved because, on June 26, 2020, the parties entered into a limited settlement agreement intended to represent a "full and complete resolution of the issues in the pending *Honig* Due Process hearing." (Doc. No. 5-6 at 1 ("*Honig* Settlement").) The parties agreed, pursuant to the *Honig* Settlement, that J.L. would be "place[d] . . . in a temporary homebound placement until a final order is issued, or until the parties enter into a settlement agreement resolving all disputes between them." (*Id.*) In October 2020— the beginning of J.L.'s fifth grade year—the parties entered into a second settlement agreement that purported to provide a "full and complete resolution of all issues" in the still-pending IDEA dispute. (Doc. No. 8-6 at 1 ("Global Settlement").) Pursuant to that resolution, WCBOE agreed to pay "for the expenses arising from J.L.'s attendance at Robson Academy, a satellite school of Faith Christian Academy." (*Id.*)

But J.L.'s time at Robson did not go smoothly; it was marked by "consistent incidences of flipping tables, ripping paper, swearing, fleeing [the] classroom and hitting the teachers." (Aug. 3, 2021 Draft IEP at 14.) Robson reported that it had "made adjustments from [J.L.] being in a class with other students to working with [J.L.] one on one" but that the school was ultimately "not . . . successful in seeing his overall behavior dissipate." (*Id.*) In March of 2021, Robson Academy informed J.L.'s parents that it would no longer serve J.L. (Doc. No. 16 at 534, S.L. Tr.) Thereafter, J.L.'s parents enrolled him in an online homeschool program through Bridgeway Academy and hired Alanah Burkhardt to work with him at home.[10] (*Id.* 11–21.)

J.L.'s parents wanted to re-enroll J.L. in WCS for the 2021–2022 school year. But during a series of IEP Team meetings in August 2021, the parties could not agree on a plan for J.L. for

---

[10] In addition to her work with J.L. at his home, Burkhardt also attended meetings with WCS as J.L.'s advocate. (*Accord* Doc. No. 16 at 416, Gilbert Tr.)

reasons discussed below. So J.L. filed a second due process complaint (Doc. No. 5-8)[11] and he was homeschooled for the 2021–2022 school year—his sixth grade year.

For the 2022–2023 school year—J.L.'s seventh grade year—he enrolled in Galileo Academy—a then-new private school with five to seven students. At Galileo, students took online classes either in person or at home, and the teachers were remote. On-site, the students had adult, non-teacher assistance. (Doc. No. 53 at 10 (citing Final Order at 18 ¶ 83).) J.L. would attend school from four to seven hours per day. (Final Order at 18 ¶ 83.) Galileo Academy did not, however, offer the full range of specialized supports that J.L. needed as part of its ordinary services covered by tuition. Galileo Academy attempted to work with J.L.'s parents to determine what supports might be necessary and how they might be paid for, but the process eventually broke down without a resolution, and J.L.'s parents withdrew him from the school—which was under the impression that J.L.'s family was moving away, although the family ultimately did not. (Doc. No. 16 at 606–612, Oliver Tr.)

In December 2022, S.L. contacted WCS to re-enroll J.L. J.L. underwent various testing, and J.L.'s IEP Team met during January and February 2023. But again, the parties could not agree on an IEP, for reasons discussed below, and in March 2023 the plaintiffs filed a third Due Process Complaint (Doc. No. 16 at 5–11), which forms the basis for this litigation. As noted above, according to the plaintiffs, J.L. is now a student at an Alabama public school, where he is "fully included in general education with non-disabled peers," is a varsity swimmer, and, as of October 8, 2024, was "undergoing Response to Intervention data-evaluations in the public school." (Doc. No. 50 at 1–2.)

_____

[11] In March 2022, the plaintiffs voluntarily withdrew their underlying substantive claims without prejudice to refiling, bringing the 2021–2022 IDEA proceedings to an end. (Doc. No. 5-9.)

6

## II.    PROCEDURAL HISTORY

The plaintiffs filed their third Due Process Complaint on March 2, 2023. (Doc. No. 16 at 5–11.) It alleges that J.L. was denied a free and appropriate public education in the least restrictive environment in the 2021–2022 and 2022–2023 school years and that WCBOE predetermined his placement for the 2021–2022 school year. The plaintiffs sought (a) a revised IEP; (b) declarative relief; and (c) costs and fees. (*Id.* at 10.) ALJ Waterhouse held a hearing in the matter over the course of three days in early May 2023. (Final Order at 1.) Nine witnesses testified, and Judge Waterhouse admitted sixty exhibits. (Final Order at 2–3.) The hearing transcript is just shy of one thousand pages. (*See* Doc. 16 at 123–1073.) On May 17, 2023, Judge Waterhouse issued a forty-eight-page Final Order resolving all of the plaintiffs' claims in WCBOE's favor. (Final Order at 47–48.) On May 22, 2023, the plaintiffs filed a Complaint (Doc. No. 1) in this court, seeking review of Judge Waterhouse's conclusions.

In the meantime, the parties litigated whether J.L. had stay put rights and, if so, where they required that he be educated. (*See* Doc. Nos. 5, 8, 9.) J.L. argued that he was entitled to an injunction returning him to the regular education classroom in WCS with his peers. (Doc. No. 5 at 3.) This court found that he was not entitled to a stay-put injunction and denied the plaintiffs' motion. (Doc. No. 27 at 17; Doc. No. 28.) The Sixth Circuit affirmed. *J.L. through S.L. v. Williamson Cnty. Bd. of Educ.*, No. 23-5704, 2024 WL 3634456, at *12 (6th Cir. Aug. 2, 2024).

The plaintiffs have filed an Amended Complaint (Doc. No. 48),[12] to which WCBOE has filed an Answer (Doc. No. 52). They seek (a) an Order reversing the ALJ's decision and directing WCS to conduct a new FBA and formulate a new Behavior Intervention Plan ("BIP");

---

[12] The plaintiffs have removed their claim regarding stay put rights. (*Compare* Doc. No. 48, *with* Doc. No. 1 ¶¶ 61–69.)

(b) an evaluation to determine whether compensatory education is necessary; and (c) costs and fees. (Doc. No. 48 ¶¶ 40–41.) The plaintiffs have filed a Motion for Judgment (Doc. No. 53), to which WCBOE has filed a Response (Doc. No. 54), and the plaintiffs have filed a Reply (Doc. No. 55).

## III.    STATUTORY BACKGROUND

The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'— more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). A FAPE consists of both "special education and related services" that are "specially designed" to address a child's "unique needs" and to provide the "supportive services" necessary to ensure that a child "benefit[s] from" his special education. 20 U.S.C. § 1401(9), (26)(A), (29). A state covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] [IEP]." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017) (quoting 20 U.S.C. § 1401(9)(D)). When a state accepts funding under the IDEA, "[a]n eligible child . . . acquires a 'substantive right'" to a FAPE. *Fry*, 580 U.S. at 158 (citation omitted). Tennessee has participated in the IDEA or its similar predecessor program for decades. *See, e.g.*, *Clevenger v. Oak Ridge Sch. Bd.*, 573 F. Supp. 349, 349 (E.D. Tenn. 1983) (applying Act's predecessor in Tennessee), *rev'd on other grounds*, 744 F.2d 514 (6th Cir. 1984). "[T]he IDEA gives the 'primary responsibility . . . for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

8

The "primary vehicle" for implementing a FAPE is the individualized education program, or "IEP." *Honig*, 484 U.S. at 311 (1988); *see also* 20 U.S.C. §§ 1412(a)(4), 1414(d). The IEP is a "written statement" developed by a child's "IEP Team," comprised of parents, teachers, and school officials. 20 U.S.C. § 1414(d)(1)(A)(i), (B). The IEP Team develops the IEP by considering the child's strengths, the parents' concerns, the results of the child's initial or most recent evaluation, and the child's academic, developmental, and functional needs. *Id.* § 1414(d)(3)(A). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.

Special education and related services must meet four requirements before they can be said to qualify as a FAPE. *See* 20 U.S.C. § 1401(9). The first three of those requirements are that the education and services "must be provided at public expense, must meet the State's educational standards, [and] must approximate the grade levels used in the State's regular education." *Rowley*, 458 U.S. at 203. The fourth requirement—identified by the Supreme Court as the "centerpiece of the statute's education delivery system for disabled children," *Honig*, 484 U.S. at 311—is that the child's education must be "provided in conformity with the individualized education program required under [20 U.S.C.] section 1414(d)." 20 U.S.C. § 1401(9)(D). An IEP must include certain individualized determinations, such as the child's "measurable annual goals" and "any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child." 20 U.S.C. § 1414(d)(1)(A)(i)(II), (VI)(aa).

"The IDEA establishes procedures by which school officials, parents, and the student can collaborate to create an IEP" that considers the unique needs of the child, the special education expertise of the educators, and the voice of the child's parents or guardians as advocates for the

9

child's best interests and educational needs. *Long*, 197 F. App'x at 432 (citing 20 U.S.C. §§ 1401(11), 1414(d)); *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 368 (1985)). The IEP Team must review a child's IEP at least annually. *Id.* § 1414(d)(4)(A)(i). An IEP is effective for a set period, typically a school year or semester.

The IDEA's "least restrictive environment" ("LRE") requirement provides that, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 866 (6th Cir. 2004) (recognizing failure to provide special education in LRE as "an IDEA violation"). The LRE "is a *non-academic* restriction or control on the IEP—separate and different from the measure of substantive educational benefits—that facilitates the IDEA's strong 'preference for mainstreaming handicapped children.'" *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 789 (6th Cir. 2018) (quoting *Rowley*, 458 U.S. at 181 n.4 (some internal quotation marks omitted and emphasis in original)). However, the preference for mainstreaming is not absolute, as "a school may separate a disabled student from the regular class under circumstances when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class." *Id.* One of the issues typically addressed in an IEP, therefore, is how to provide the child special education and related services in the LRE, appropriate to his needs. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(cc), (V).

The IDEA also establishes various procedural safeguards to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education," including input into the IEP, "and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12; *see generally* 20 U.S.C. § 1415. Among other safeguards, the parents are entitled to receive prior written notice ("PWN") about any change in the educational placement or FAPE. 20 U.S.C. § 1415(b)(3). And parents may file an administrative due process complaint, *id.* § 1415(b)(6), (7)(A), which triggers an impartial due process hearing before the state or local educational agency. *Id.* § 1415 (f)(1)(A), (3)(A). In Tennessee, due process hearings are conducted by administrative law judges, employed by the Secretary of State, who have received training in special education law and the IDEA, specifically. *See* Tenn. Code Ann. § 49-10-606. "[A]t the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Endrew F.*, 580 U.S. at 392 (citing 20 U.S.C. § 1415(i)(2)(A)).

## IV.    STANDARD OF REVIEW

In a lawsuit challenging an IDEA administrative decision, the district court will undertake a "modified de novo review" of the administrative decision. *Rowley*, 458 U.S. at 206. In doing so, the district court must make an independent examination of the evidence and base its decision on a preponderance of the evidence contained in the complete record, while giving "due weight" to the factual findings made in the state administrative proceedings, particularly when educational expertise is essential to those findings. *See M.G. by & through C.G. v. Williamson Cnty. Sch.*, 720 F. App'x 280, 283 (6th Cir. 2018) (*quoting Deal*, 392 F. 3d at 849).

Towards this objective, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The court may not "simply adopt the state administrative

11

findings without an independent re-examination of the evidence," but neither may it "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Rowley*, 458 U.S. at 206; *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998). The "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *M.G.*, 720 F. App'x at 283; *see also Burilovich v. Bd. of Educ.*, 208 F.3d 560, 567 (6th Cir. 2000); 20 U.S.C. § 1415(i)(2).

Originally developed in the Supreme Court's *Rowley* decision, the district court's review is characterized as a two-part inquiry concerning: (1) whether the subject school district complied with the procedures set forth in the IDEA; and (2) whether the school district complied with the substantive provisions of the IDEA by providing an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Deal*, 392 F.3d at 853–54. Although the IEP at issue must be "strictly review[ed] . . . for procedural compliance," a procedural violation does not constitute a denial of a FAPE unless it also produces substantive harm. *Id.* (citing *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)). That is, "technical deviations will not render an IEP invalid." *Knox Cnty. v M.Q.*, 62 F.4th 978, 991 (6th Cir. 2023) (quoting *Deal*, 392 F.3d at 854). If the school system meets procedural requirements of the IDEA, "greater deference is to be afforded to" the school district's decision. *Dong v. Bd. of Educ.*, 197 F.3d 793, 800 (6th Cir. 1999).

In reviewing substantive compliance, courts are not permitted to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Deal*, 392 F.3d at 854 (quoting *Rowley*, 458 U.S. at 206). Courts are also cautioned to "to avoid imposing their view of preferable educational methods" on the school districts since the "primary

12

responsibility for formulating the education to be accorded a [child with disabilities], and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* (citing *Rowley*, 458 U.S. at 207). The party challenging the administrative law judge's decision has the burden of proof to show by a preponderance of the evidence that the IEP was inappropriate. *Deal*, 392 F.3d at 854.

## V.     DISCUSSION

### A.     Predetermination in 2021

The plaintiffs argue that, in its August 4, 2021 PWN, WCBOE *predetermined* J.L.'s placement in therapeutic day schools ("TDS"), in violation of J.L.'s IDEA rights. (Doc. No. 48 ¶¶ 113–14, 9–20, 33; Doc. No. 53 at 15–22.) The defendant responds, first, that the plaintiffs waived their predetermination argument. (Doc. No. 54 at 12–13.) Second, the defendant argues that, based on the information it had during the late-summer IEP Team meetings, the Team decided that J.L. could not be returned to the classroom. Instead, he needed to be temporarily homebound until a suitable TDS could be found, representations by J.L.'s mother that he had progressed notwithstanding. But, unhappy that J.L. would not return to the classroom, the defendant asserts that J.L.'s parents misled the IEP Team and obstructed the search for such a placement. So, the parties were unable to formulate an IEP for the 2021–2022 school year, resulting in J.L.'s withdrawal from WCS. (Doc. No. 54 at 4–6, 10.)

### 1.     Legal Background

Predetermination occurs when a school district selects a particular program or school too early in the IEP process, to the detriment of parental involvement. *See Deal*, 392 F.3d at 857–59. Predetermination arises from the "general rule . . . that placement should be based on the IEP." *Spielberg by Spielberg v. Henrico Cnty. Pub. Sch.*, 853 F.2d 256, 259 (4th Cir. 1988) (citation

13

omitted); 34 C.F.R. § 300.116(b) ("The child's placement . . . is based on the child's IEP."); *see also N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 617 (6th Cir. 2014) (noting that educational placement must be based on the IEP under 34 C.F.R. § 300.116(b)(2)). "[A]dequate parental involvement and participation in formulating an IEP . . . appear to be the [Supreme] Court's primary concern in requiring that procedures be strictly followed." *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990).

Pretermination is a procedural violation, which entitles plaintiffs to relief only when the violation constitutes a denial of a FAPE that caused substantive harm to the child or impeded parents' ability to meaningfully participate in the IEP process. *Deal*, 392 F.3d at 857; 34 C.F.R. § 300.513(a)(2). "Caselaw tends to demonstrate that predetermination is a high bar." *D.S. by & through R.S. v. Knox Cnty.*, No. 3:20-cv-240, 2021 WL 6496726, at *7 (E.D. Tenn. June 21, 2021). To make out a predetermination claim, a plaintiff must show that the school district came into the IEP meetings with closed minds, having already decided material aspects of the child's educational program without parental input. *See N.L. v. Knox Cnty. Schs.*, 315 F.3d 688, 694–95 (6th Cir. 2003) (finding no predetermination where representatives from the school district "recognized that they were to come to the meeting with suggestions and open minds, not a required course of action"); *see also Deal*, 392 F.3d at 858 (finding predetermination where the school officials "did not have open minds and were not willing to consider" a particular service the parents thought the child needed to benefit from his education). Courts often find predetermination where school districts have a policy—official or unofficial—regarding the child's placement. *Accord D.S.*, 2021 WL 6496726, at *6 (citing *Deal*, 392 F.3d at 858). But "[i]n the absence of a policy, a finding of predetermination is rare." *Id.* (collecting cases); *see also G.A. v. Williamson Cnty. Bd. of Educ.*,

594 F. Supp. 3d 979, 990 (M.D. Tenn. 2022) (Crenshaw, C.J.) (noting that a troubling practice, if applied without exception, may lead to predetermination).

Predetermination, however, does not mean that the school district cannot come into IEP meetings with ideas about a child's education. "[P]redetermination is not synonymous with preparation." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006). "The IDEA and its implementing regulations allow 'school evaluators [to] prepare reports and come [to IEP meetings] with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.'" *C.A. v. Williamson Cnty. Bd. of Educ.*, No. 3:19-cv-00272, 2021 WL 3883954, at *1 (M.D. Tenn. Aug. 31, 2021) (Newbern, M.J.) (quoting *Nack*, 454 F.3d at 610). On the other hand, parents' "[p]articipation must be more than a mere form; it must be meaningful." *Deal*, 392 F.3d at 858.

>    2.    *Factual Background*

J.L. wanted to re-enroll in WCS for the 2021–2022 school year, so he underwent various testing in Summer 2021 (Aug. 3, 2021 Draft IEP at 4–13). WCS held two IEP Team meetings just before the school year started—on July 30 and August 3, 2021—and one meeting on August 6, 2021, the first day of school, which was characterized as a "follow-up" meeting to discuss a BIP, rather than the IEP. (Doc. No. 54 at 4.)[13] The timing of the meetings is significant not only because the parties had a beginning-of-the-school-year deadline to have an IEP in place, 34 C.F.R. §

---

[13] The audiovisual recordings of the online August 3 and August 6, 2021 IEP Team Meetings are in the record. (Doc. No. 24.)

300.323, but also because an updated FBA takes about six weeks to complete. (Doc. No. 53 at 4; Doc. No. 54 at 21 n.14.)[14]

At issue, in part, is what the IEP team decided during the August 3, 2021 IEP Team meeting, which included several WCS staff, S.L., and Alanah Burkhardt as J.L.'s advocate and behavioral specialist. As the plaintiffs put it, the "[t]eam agreed, in the August 3, 2021 IEP [meeting], that J.L.'s behaviors impede his learning or that of others." (Doc. No. 53 at 5.) The parties dispute whether the IEP Team decided that J.L. would go to *a* TDS and that the next step was to determine *which TDS*, or whether the Team decided to consider, in part by touring several TDS options, *whether any* TDS placement would be appropriate for J.L. More generally, the dispute between the parties is whether J.L.'s behavioral symptoms precluded his attending general education classes.

After the August 3 IEP Team meeting, on August 4, 2021, the district issued a PWN stating that, during the August 3 meeting, the "team determined that [J.L.] would temporarily receive homebound [instruction] . . . with a transition to a therapeutic setting in approximately 3 weeks (for which another IEP meeting will need to be scheduled)." (Doc. No. 16 at 1273, Aug. 4, 2021 PWN.) In addition, the PWN stated that the reason for this proposal was that, "[d]ue to [J.L.'s] . . . .behavior, the team determined that [J.L.] required a therapeutic setting to be able to successfully

---

[14] The parties disagree about the reason for the delayed meetings. The plaintiffs state that they "had given ample notice of [J.L.'s] return" and that the district was "up against the clock." (Doc. No. 53 at 4.) The defendant states that the "Plaintiffs delay[ed] the scheduling of initial assessments and the initial IEP meeting." (Doc. No. 54 at 4.) As indicated in the August 4, 2021 PWN, the defendant "first requested an IEP meeting through counsel on April 6, 2021 and . . . had been offering IEP meeting dates since July 1, offering multiple date options within the parents' requested dates of Thursday and Friday." (Doc. No. 16 at 1274, Aug. 4, 2021 PWN at 2.) The plaintiffs respond that J.L.'s parents did not delay the meetings, but merely offered other dates, "as they are professionals too." (Doc. No. 55 at 9.) And S.L., in the August 6, 2021 IEP meeting, stated that "we never received an IEP meeting request April 6." (Doc. No. 24, Aug. 3, 2021 IEP Team Recording at 1:05:21.)

16

transition back to a regular educational setting. Based on the team's decision that a therapeutic placement was needed, additional time was needed to determine which local therapeutic school would accept [J.L.] as a student/contract with WCS." (*Id.*)

      3.    *Waiver*

The defendant argues that the plaintiffs have "waived their predetermination claim by failing to plead it." (Doc. No. 54 at 12–13.) So, the court must determine whether the plaintiffs have pled predetermination. They have. The defendant's waiver argument therefore fails.

According to the defendant, the Amended Complaint alleges that "the IEP Team's determination of both placement phases at the August 23, 2021 IEP meeting was 'predetermination' because the proposal was made 'sight-unseen by J.L.'s parent.'" (*Id.* at 13 (quoting Doc. No. 48 ¶ 33).) That is, in the Amended Complaint, the defendant states, the plaintiffs allege that predetermination occurred because J.L.'s parents had not yet seen the TDS schools under consideration when the Team decided that J.L. would attend a TDS. By comparison, the defendant states, in the plaintiffs' Motion for Judgment, the plaintiffs' predetermination claim depends on "an administrative placement decision contrary to the IEP team decision." (*Id.* (citing Doc. No. 53 at 14).) As the defendant quotes the plaintiff: "'[T]he [IEP] Team agreed to "look" at [TDSs], "investigate" them, and *then* "meet back together to make determinations" about *whether* they "are appropriate"' but WCBOE 'administration changed the IEP Team's plan from "whether" a TDS to "which" TDS.'" (*Id.* (quoting Doc. No. 53 at 16).)

But what the parties agreed to at the late-summer 2021 IEP meetings is contested. The plaintiffs' argument supporting their predetermination claim is that the Team agreed that J.L. would be temporarily homebound, the Team would assess TDS options, and the Team would reconvene to consider whether a TDS was the right path, and, if so, which—if any—school would work for J.L. (Doc. No. 53 at 16–22.) But that is not what happened, according to the plaintiffs;

17

instead, "WCS administration changed the IEP's plan from 'whether' a TDS to 'which' TDS." (*Id.* at 17.) That J.L.'s parents had not visited the proposed schools before the August 4, 2021 PWN is the basis of their claim that WCS acted contrary to the Draft IEP of August 3, 2021. Therefore, the defendant's waiver argument fails.

### 4. The plaintiffs' predetermination argument

During the August 3 meeting, WCS's behavioral specialist—Amanda Hare—proposed starting J.L. at a TDS. (Doc. No. 53 at 6.) According to the plaintiffs, the "IEP team chose to pause and visit three sample TDSs so that Hare's suggestion could be meaningfully considered as a Team." (Doc. No. 53 at 7 (citing Final Order at 14–15 ¶ 68).) That is, the "IEP recording and testimony clearly show the Team agreed to 'look' at TDSs, 'investigate' them, and *then* 'meet back together to make determinations' about *whether* they 'are appropriate.'" (Doc. No. 53 at 16 (citing Doc. No. 24, Aug. 3 IEP Team Recording; Final Order at 14 ¶ 67; Doc. No. 16 at 232, 235, Springer Tr.)[15] That is, having proposed the idea of a TDS, as the plaintiff argues, the agreed-upon (as of August 3) next step was to visit the schools to allow the IEP team to "engage about the curriculum, supports, number of students, and distance from home." (Doc. No. 53 at 16.) *After* the TDS school

---

[15] These citations do not all support the plaintiffs' views. The ALJ found that "S.L. and her advocate did not agree with the *proposed IEP*." (Final Order at 14 ¶ 67 (emphasis added).) The Final Order's previous paragraph discusses the proposed IEP: "The temporary placement of homebound was proposed by the WCS staff members of the IEP team to allow time for the most informed decision to be made with the parent in agreement, *and to find a therapeutic day school* to provide the supports that J.L. needed to be successful." (*Id.* ¶ 66 (emphasis added).) That is, the finding of fact the plaintiffs cite incorporates by reference, in the previous paragraph, an account of the meeting that the plaintiffs now dispute. Moreover, the plaintiffs cite testimony by Teri Driver, Spring Station Middle School teacher, in support of their position. But when asked during the due process hearing about the IEP meetings, Driver's testimony supports the defendant. When he was asked where J.L. would receive special education services, Driver answered: "He would go where the IEP team agreed would be his least restrictive environment." Driver was then asked, "The persons for Williamson County thought that that was homebound and then transition to therapeutic day school?" to which Driver answered, "Yes, that is correct." (Doc. No. 16 at 258–59, Driver Tr.)

18

visits, the plaintiffs state, "J.L.'s mother . . . was ready to participate and contribute," including by planning to give several "reasons that a TDS was *not appropriate* for J.L.," which she was "entitled to reasonably contribute," and, if the IEP Team had considered her contribution, "the Team could have accepted, rejected, and certainly debated Hare's proposal of a TDS." (Doc. No. 53 at 17.)

But such a discussion never happened, the plaintiffs argue, because the WCS members of the IEP Team "changed the IEP Team's plan from 'whether' a TDS to 'which TDS' in its August 4 PWN. (Doc. No. 53 at 17.) According to the plaintiffs, the defendant thereby predetermined J.L.'s placement into *a* TDS school, in violation of the IDEA. Having made the determination, the plaintiffs argue, WCS "*refused* to hold the follow-up IEP meetings unless J.L.'s parent[s] agreed that J.L.'s very intimate educational records be divulged to all three TDS locations," which J.L.'s parents did not do. (Doc. No. 53 at 18–19 (emphasis in original) (citing Doc. No. 17 at 241, Oct. 20, 2021 PWN ("There is no reason to schedule an IEP meeting because the IEP team cannot consider and propose a placement . . . when it is unknown whether that placement will accept [J.L.] into their program.")).) But conditioning a follow-up meeting on J.L.'s parents' releasing his educational data was unnecessary, the plaintiffs argue, because "J.L. was not seeking or intending to enroll [in any TDS], but to discuss what [S.L.] saw as *serious problems* with offerings at" the three TDSs the Team toured. (Doc. No. 53 at 19–20.)

Thus, the plaintiffs argue that the defendant predetermined J.L.'s placement by deciding that he would attend a TDS before touring any of them and without allowing parental participation in the decision.

### 5.    *The defendant's argument in response*

The defendant argues that the evidence shows that the IEP Team agreed on August 3, 2021 that J.L. required a TDS level of support. But the Team was never able to propose a suitable TDS placement "because the IEP team needed to gather information on specific TDS programs to

determine a specific placement to meet J.L.'s needs and that would accept him as a student." (Doc. No. 54 at 13.) J.L.'s parents refused to release his records to the schools, so no school would make an admission decision, and therefore the team was "stuck." (Doc. No. 54 at 18–19; Doc. No. 16 at 929, Diego Tr.) The defendant maintains that, throughout the IEP process, J.L.'s parents were permitted to, and did, actively participate, and the team took their contributions seriously. (Doc. No. 54 at 17–18.) Thus, the defendant argues, J.L.'s parents were not denied meaningful participation and WCS did not predetermine J.L.'s placement.

6.    *The ALJ's findings*

The ALJ determined that J.L.'s placement was not predetermined. (Final Order at 44.) First, the ALJ found that, during the August 3 meeting, the Team discussed what became the final proposal for a 2021–2022 IEP, dated August 3, 2021. The Draft IEP proposed a temporary homebound placement, followed by a "transition to a therapeutic setting for which another IEP meeting would be scheduled to discuss therapeutic day schools and options." (Final Order at 14 ¶¶ 64–65.) The temporary placement of homebound "was proposed by the WCS staff members of the IEP team to allow time for the most informed decision to be made, with the parent in agreement, and to find a therapeutic day school to provide the supports that J.L. needed to be successful." (*Id.* ¶ 66.)

Furthermore, the ALJ found that the evidence the plaintiffs proffered did not support the contention that J.L. was denied meaningful parental involvement. (Final Order at 33–34.) The ALJ found that the parents were invited to all IEP meetings, and J.L.'s advocate and S.L. were deeply engaged. (*Id.* at 34.) The IEP team treated the IEP as a draft document and updated it based on the parents' concerns. The Team evaluated all of the evidence in front of it. (*Id.*) The ALJ further found:

The 2021 WCS IEP team spent many hours with the parent, explained therapeutic day schools, provided for research and gathering of facts relating to them, and listened to the parent's and advocate's concerns. Time for the research and fact-gathering was built into the placement proposal, which then allowed for additional meetings of the IEP team. S.L. had the opportunity and did tour the therapeutic day schools discussed. The WCS members also toured the schools. However, the IEP team was prevented from meeting further about the placement proposal because S.L. refused to participate in the process.

(*Id.* at 42.)

### 7. Whether a "placement" occurred

The parties disagree not only about what the IEP Team decided on August 3, but also whether, if they decided that J.L. needed to attend *a* TDS, whether that constitutes a "placement" under the IDEA. This is significant, according to the parties, because predetermination requires placement.

The plaintiffs argue that the August 4, 2021 PWN, in contrast to the August 3 meeting, determined J.L.'s placement. (Doc. No. 53 at 18.) The defendant argues that, "[d]espite Plaintiffs' assertions to the contrary, a *decision that the IEP team planned to meet again to determine a TDS placement* (regardless of whether the team planned to discuss 'whether' or 'which' TDS) was *not a placement determination*, nor was documentation of such decision in the PWN." (Doc. No. 54 at 14 (emphasis in original).) More broadly, the defendants argue that, during the August 3 meeting, the Team determined—and the PWN reflects—the level of support J.L. requires: the services provided only by a TDS. A placement determination, however, requires selecting a specific school—which the parties all concede did not happen—and, moreover, requires an IEP Team meeting to decide. As the plaintiffs point out, however, the defendant captions a subsection in its Response in Opposition to the plaintiffs' Motion for Judgment "The IEP team made its placement decisions . . . ." (Doc. No. 55 at 3 (quoting Doc. No. 54 at 15).)

The IDEA does not define the term "educational placement." *Accord J.W. v. Clarksville/Montgomery Cnty. Sch. Sys.*, No. 3:12-cv-01083, 2015 WL 13859550, at *5 (M.D. Tenn. Apr. 6, 2015) (Nixon, S.J.). Nor do the applicable regulations. *See* 34 C.F.R. § 300.4–300.45 (omitting "placement" or any variation from the "Definitions Used in this Part," which includes § 300.116 (Placements)). The Sixth Circuit, however, refers to a placement's enumerated requirements as "definitions." *N.W.*, 763 F.3d at 617 (referring to the three requirements in § 300.116(b)). The third requirement of a child's placement, in addition to requirements that a placement be determined at least annually, § 300.116(b)(1), and be based on the child's IEP, *id.* § 300.116(b)(2), is that the "child's placement . . . [i]s as close as possible to the child's home." *Id.* § 300.116(b)(3). This suggests that a "placement" entails a specific school. *Accord, e.g.*, *N.W.*, 763 F.3d at 617 (defining placement, for purposes of determining a child's "current educational placement," as "requir[ing] the school district to approve of the educational *setting*" (emphasis added)).

On the other hand, the plaintiffs cite this court's opinion in *J.W. v. Clarksville/Montgomery County School System*, in which the court wrote that "educational placement means 'educational program—not the particular institution where that program is implemented.'" 2015 WL 13859550, at *5 (quoting *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003)). And a change in location does not entail a change of placement. *Id.* (citing *D.K. v. D.C.*, 983 F. Supp. 2d 183, 145 (D.D.C. 2013) ("Maintaining a child's placement in an educational program that is *substantially and materially* similar to the former placement is not a change in placement." (emphasis added by *D.K.*))). This suggests that a "placement" need not entail selecting a specific school.

22

However, the court finds, for the purposes of this case, that it is immaterial whether the Team's decisions constitute a "placement." For the reasons described below, the court agrees with the ALJ. The evidence supports the defendant's position that, in the August 3, 2021 meeting, the Team determined that J.L. needed to attend a TDS, which determination is accurately reported in the PWN. Moreover, in making that decision, the Team allowed for meaningful parental involvement and did not otherwise predetermine the decision—"placement" or otherwise.

### 8. *This court's findings*

The plaintiffs have not shown that the defendant predetermined J.L.'s placement for 2021–2022–either because the WCS members of J.L.'s IEP Team administratively predetermined his placement by unilaterally changing the plan between August 3 and August 4, or by denying J.L.'s parents meaningful involvement in the IEP process.

### a) *The August 3, 2021 Meeting*

The plaintiffs' interpretation of the meeting is that the Team decided that it would tour three TDS options to help determine whether TDS placement was the right choice for J.L. The defendant's interpretation of the meeting is that the Team decided that J.L. needed a TDS-level of support, and that the team would tour the schools to see if any of them would work for J.L.

The court has reviewed the recorded hearing and other evidence the parties cite. The plaintiffs' interpretation is not fantastical. As the plaintiffs note, some of the school staff's language, interpreted in isolation, is ambiguous. (*See* Doc. 53 at 7, 16.) For example, one school official characterized the proposed plan this way: "We set up tours to go and look at those places, and then meet back together to make determinations." (Doc. No. 24, Aug. 3, 2021 IEP Meeting Recording at 1:57:55–1:58:01.) At the end of the meeting, the same official summarizes the view of the WCS Team-members: "I think I heard the rest of the team, from the school, indicate homebound as a transition. And then shifting to see what, you know, are any other therapeutic day

23

schools -- what does that look like, and are they appropriate?" (Doc. No. 24, Aug. 3, 2021 IEP Meeting Recording at 2:06:11–2:06:30.).

But when the recorded meeting is viewed as a whole, the defendant's interpretation of the meeting is the more accurate one. This is what the ALJ found. (Final Order at 14 ¶ 66 ("The temporary placement of homebound was proposed by the WCS staff members of the IEP team to allow time for the most informed decision to be made, with the parent in agreement, and *to find a therapeutic day school* to provide the supports that J.L. needed to be successful." (emphasis added)).) The plaintiffs have not proffered sufficient evidence to convince this court to reach a factual finding contrary to the ALJ's. The record before this court does not support the plaintiffs' contention that "the IEP Team had *not* made a decision on whether J.L. . . . . required a TDS." (Doc. No. 53 at 8.) Over the course of the meeting, school officials raised various concerns about J.L.'s attending Spring Station Middle School. And they concluded that he required an off-site therapeutic setting. (*See, e.g.*, Doc. No. 24, Aug. 3, 2021 IEP Meeting Recording at 2:06:11–2:06:30 (a school occupational therapist stating that a TDS would give him a chance to be successful, whereas attending Spring Station would not); *id.* at 1:54:10–1:54:15 (a school psychologist stating that, "a therapeutic setting seems like a next step").)

Moreover, the record does not reveal that the plaintiffs objected to the August 4 PWN's characterization of the August 3 meeting, even though there were multiple, natural opportunities for such objections. After the August 3 IEP meeting, on August 4, WCS issued a PWN stating that, during the August 3 meeting, the "team determined that [J.L.] would temporarily receive homebound . . . with a transition to a therapeutic setting in approximately 3 weeks (for which another IEP meeting will need to be scheduled)." (Doc. No. 16 at 1273, Aug. 4, 2021 PWN at 1.) In addition, the PWN stated that the reason for this proposal was that, "[d]ue to [J.L.'s] . . . .

24

behavior, the team determined that [J.L.] required a therapeutic setting to be able to successfully transition back to a regular educational setting. Based on the team's decision that a therapeutic placement was needed, additional time was needed to determine which local therapeutic school would accept [J.L.] as a student/contract with WCS." (*Id.*)

The next day, August 5, S.L. sent an email to the IEP Team meeting's facilitator, in which she stated, "I understand the school[']s recommendations, however, we are concerned about how restrictive the plan is." (Doc. No. 17 at 26, Aug. 5, 2021 email from S.L. to Maria Griego, Executive Director, Student Support Services, WCS.) After some back-and-forth, Griego responded to S.L.'s questions. Among other things, Griego wrote:

> The IEP Team determined that *[J.L.] could not be appropriately served at Spring Station*.
>
> At this point, *the IEP team has determined that [J.L.]'s disability requires support in a therapeutic setting* (with temporary homebound until such placement can be determined by the team). While we can discuss this in more detail tomorrow, the IEP team has determined that [J.L.] is currently unable to safely participate in the general education setting with his nondisabled peers, which would include nonacademics and extracurricular activities.
>
> Because WCS does not have a therapeutic placement on its campus, we contract with several different private schools for such placements. *For us to get a therapeutic placement in place,* we must have your consent for a release of information to consult with and provide needed records to the local therapeutic schools *to determine which school would be a good fit* for [J.L.]. Additionally, *we want to make sure that you have the opportunity to visit any therapeutic day school to be considered by the IEP team prior to the team making such decision*.

(*Id.* at 25, Aug. 5, 2021 email from Maria Griego to S.L. (emphasis added).)

The day after the emails, on August 6, the IEP team met again to discuss a BIP. Toward the end of the meeting, S.L. proposed that the team discuss J.L.'s placement, which they did for roughly eighteen minutes. (*See* Doc. No. 24, Aug. 6, 2024 IEP Meeting Recording at 00:48:00–

25

1:06:00.)[16] At no point during the meeting did S.L. contest the summary of the August 3 meeting as presented in the PWN or in Griego's email. (*See, e.g.*, *id.* at 1:03:47–1:03:47 (Maria Griego: That's the plan . . . is to use homebound while we locate an appropriate therapeutic day school. That's what the team proposed . . . earlier this week.").)[17]

The court, giving due weight to the factual findings of the ALJ judge, does not find that the evidence before it preponderates against what the ALJ found that the IEP Team decided during the August 3, 2021 meeting.

### b) Predetermination

In mid-August 2021, IEP Team members, including S.L.'s parents, toured the three TDS schools under consideration. For the schools to admit J.L., they required his records, which his parents would not release. (Doc. No. 53 at 17–18; Doc No. 54 at 18–19.) The IEP Team did not meet again to formulate a 2021–2022 IEP.

The plaintiffs argue that the defendant predetermined J.L.'s placement in a TDS, in part, because it denied his parents meaningful involvement by refusing to meet with them again unless they released J.L.'s records, which they would not. (Doc. No. 53 at 21–22.) The plaintiffs claim that, if J.L.'s parents had been allowed to meet with the district, S.L.'s "input would have included reasons that a TDS was *not appropriate* for J.L." (*Id.* at 17 (emphasis in original).) "But WCS refused to hold a meeting, thus ensuring that *no participation* occurred." (*Id.* (emphasis in original).)

---

[16] This, notwithstanding the plaintiffs' statement that "[t]he short IEP meeting of August 6, 2021 did not address placement." (Doc. No. 55 at 4.)

[17] While S.L. did not contest the characterization of the plan, she did oppose signing releases that would allow WCS to speak with the three TDSs under consideration. (*See* Doc. No. 24, Aug. 6 IEP Meeting Recording at 1:03:24–1:03:38 (Griego: "The proposed IEP indicates homebound, and we would like releases in order to talk with some therapeutic schools to see if we can get him in school as soon as possible." S.L. "No, that's not okay. That's not okay.").)

26

The parties' representations to the contrary, the record shows that (1) the plaintiffs requested additional meetings after August 6, 2021 and (2) the defendant rebuffed meeting requests as pointless because the plaintiffs refused to release J.L.'s records to any of the schools the team was considering, thereby precluding any further placement discussion.

However, the school's refusal to conduct additional meetings does not mean that J.L.'s parents were denied meaningful participation in the IEP process, such that J.L.'s placement in a TDS was predetermined. The ALJ found that the "IEP team was prevented from meeting further about the placement proposal because S.L. refused to participate in the process." (Final Order at 42.) And the plaintiffs do not argue that J.L.'s parents were unable to meaningfully participate in the IEP process up until August 6, 2021. Indeed, the record shows the deep involvement J.L.'s parents had in the IEP process. Because the IEP Team determined, in the August 3, 2021 meeting, that J.L. required a TDS-level placement, the plaintiffs have not met their burden to show how the district's refusal to meet with them to discuss their continued objections after that date constitutes a denial of meaningful parental involvement.

For the foregoing reasons, the court finds that the defendant did not predetermine J.L.'s placement in 2021.

### B. Alleged denial of a FAPE in 2021

In his due process complaint, J.L. alleges that, in 2021, the defendant violated his substantive rights under the IDEA: "WCS made placement decisions outside of the IEP Team which had the effect of removing [J.L.] from WCS altogether, . . . not affording him a FAPE in his LRE." (Doc. No. 16 at 10, Due Process Complaint ¶ 17 (Mar. 2, 2023); *see also* Doc. No. 48 ¶ 17.) The Amended Complaint specifies: "In 2021, WCS created an IEP . . . without adequate data. It denied meaningful parental participation and engaged in predetermination . . . . It could not

27

possibly determine whether any proposed benefit of such highly restrictive environments could be [provided] within WCS." (Doc. No. 48 ¶ 33.)

After touring the schools, the parties were at an impasse. According to the plaintiffs, "[b]y October 20, 2021, J.L. remained stuck on homebound well beyond the three weeks stated in the IEP." (Doc. No. 53 at 10.) The plaintiffs allege that the October 20, 2021 PWN "unilaterally extended J.L.'s homebound, without an IEP meeting, again demanding that his records must be sent to all of the schools just to receive an IEP meeting." (Doc. No. 53 at 10 (citing Final Order at 17 ¶ 77).)

The plaintiffs argue that, because the IEP Team predetermined J.L.'s placement, he was "left on indefinite homebound," which caused a three-fold harm. First, homebound is an "actual substantive harm." (Doc. No. 53 at 22.) Second, it "forced J.L. into fits and starts of other placements to get an education." (Doc. No. 53 at 22.) In addition, because J.L. was on homebound, "WCS ensured that an updated FBA within WCS was impossible." (Doc. No. 53 at 23.) The FBA that the district had conducted in 2021 was flawed, according to the plaintiffs, who cite a report by the district's behavior specialist who conducted the FBA. (Doc. No. 53 at 23 (citing Doc. No. 17 at 172, 181, Dec. 9, 2021 FBA).) The defendant maintains that there was no placement determination, but whatever the IEP Team decided in the August 3, 2021 meeting, it was not predetermination. In any case, the defendant argues that J.L. did not suffer substantive harm, in violation of the IDEA.

The plaintiffs' briefing makes clear that they view the alleged predetermination as causing the substantive harms they allege for the 2021–2022 school year. (Doc. No. 53 at 2 (asserting that the district's alleged predetermination and subsequent refusal to meet with J.L.'s parents effectively "le[ft] J.L. on homebound status"); *see also* Doc. No. 53 at 7–11, 14.) Specifically, the

28

plaintiffs state that "[b]eyond" the *per se* substantive harm of "predetermination and denial of meaningful participation," "being left on indefinite homebound is an actual substantive harm which, in this case, forced J.L. into fits and starts of other placements to get an education." (Doc. No. 53 at 22.) In pre-hearing briefing, the plaintiffs identify the defendant's proposed "placement of homebound" as "a denial of FAPE in the LRE for 2021." (Doc. No. 16 at 1011, Findings of Fact and Conclusions of Law Proposed by the Petitioners ¶¶ 28–29 (May 16, 2023).) In their Reply, the plaintiffs argue that any harm from the denial of a FAPE stemmed entirely from J.L.'s homebound status. (Doc. No. 55 at 5).[18]

Pretermination is a procedural violation. *Deal*, 392 at 857–59. "A finding of procedural violations does not necessarily entitle [plaintiffs] to relief." *Deal*, 392 F.3d at 854. "[R]ather, a school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Knable*, 238 F.3d at 765. "Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process" or "deprive an eligible student of an individualized education program or result in the loss of educational opportunity." *Id.* at 765–66; *see also* 34 C.F.R. § 300.513(a)(2).

The ALJ found that the plaintiffs "did not prove by a preponderance of the evidence procedural or substantive violations of the IDEA" and determined that "J.L. was provided FAPE in the LRE under the IDEA for the 2021–2022 and 2022–2023 school years." (Final Order at 39–

---

[18] The parties dispute whether, and to what extent, J.L. was on homebound during Fall 2021. (*See* Doc. No. 54 at 18–19; Doc. No. 17 at 132, December 2021 Psychoeducational Comprehensive Reevaluation Report ("WCS also offered to provide homebound services while in due process; however, [J.L.]'s parents never allowed homebound services to commence. Ultimately, [J.L.] was marked absent until he was withdrawn from Spring Station Middle School on 11/15/21."); Doc. No. 55 at 5.)

40.) This court has found that the plaintiffs have not shown that it should reverse the ALJ's determination "that J.L.'s placement was not predetermined by WCS for the 2021–2022" school year. (Final Order at 44.) Thus, the plaintiffs have not proffered sufficient evidence for the court to grant their request to reverse the ALJ's decision as to the substantive violations that allegedly flow from an unproven procedural violation.

### C.    Alleged denial of a FAPE in 2023

In his due process complaint, J.L. alleged that the defendant violated his substantive rights under the IDEA in 2023: "WCS has issued a PWN which is overly restrictive, a denial of a FAPE in the LRE, without *current* supporting data." (Doc. No. 16 at 9, Due Process Complaint ¶ 16 (Mar. 2, 2023) (emphasis in original).) The plaintiffs now claim that, in 2023, WCS created an IEP using an outdated FBA and that the placement the IEP proposed was so restrictive that it made it impossible to conduct an FBA that would accurately reflect his progress. (Doc. No. 48 ¶ 32, 34, 37.)

#### 1.    *Factual Background*

In early 2023, J.L. again sought to attend Spring Station Middle School. So, in January and early February 2023, he underwent eligibility testing and his IEP Team reconvened over several sessions. (Doc. No. 16 at 1360, Feb. 27, 2023 PWN.) J.L.'s parents proposed that he attend Spring Station Middle School for full days, in the regular education setting, with support. (Doc. No. 53 at 13.) S.L. told the IEP Team that J.L. had shown significant growth (Doc. No. 16 at 1306, Draft IEP Feb. 7, 2023 at 2) and that J.L.'s behaviors no longer required the level of support earlier evaluations dictated. (Doc. No. 16 at 1358, Feb. 27, 2023 PWN at 1.) But the other members of the IEP team disagreed. (*Id.*) According to the February 7, 2023 Draft IEP, however, J.L.'s "eligibility of emotional disturbance presents as inappropriate types of behaviors." (Doc. No. 16 at 1304, Feb. 7, 2023 Draft IEP at 2.) "He demonstrates work refusals, difficulties accepting

feedback, and inappropriate behaviors such as negative self-talk, shutting down, cursing, and eloping." (*Id.*) He had "deficits in sustained attention, time management, organization, and impulsivity," which "impact his ability to complete tasks in a timely manner" and "hinder[] his ability to master content." (*Id.*) In addition, the behaviors he "exhibited . . . impede [J.L.]'s learning and that of others." (Doc. No. 16 at 1359, Feb. 27, 2023 PWN at 2.)

After testing J.L. and considering various data, the school members of the IEP team proposed, instead, that J.L. attend Spring Station Middle School for four hours per day, with one-on-one-support, in a special education setting. (Doc. No. 16 at 1332, Feb. 7, 2023 Draft IEP at 28.) In response, J.L.'s parents withdrew him from WCS, enrolled him in homeschooling, and filed the due process complaint at issue. (Doc. No. 53 at 14.)

Among other data the IEP Team considered was a December 2021 FBA the district performed while J.L. was homeschooled. The district's board-certified behavior analysist, Rachel Hopp, conducted an FBA over nine days in late 2021. (Doc. No. 17 at 1775, Dec. 9, 2021 WCS FBA at 5.) The assessment took place in J.L.'s home and in a conference room at Spring Station Middle School. (*Id.* at 171, WCS FBA at 1.) As the plaintiffs point out, Hopp noted that "both environments in which the observations for [the] assessment were conducted were highly controlled and contained a variety of accommodations. . . . [O]bservations in a lesser controlled environment or an environment with peers or a different ratio of teacher to student may evoke different responses." (Doc. No. 53 at 12.)

### 2. *The plaintiffs' argument*

First, the plaintiffs argue that the IEP Team made its placement determination for an abbreviated school day, in a one-on-one, special-education setting without the benefit of an updated FBA (Doc. No. 53 at 12)—itself a violation of IDEA (Doc. No. 48 ¶¶ 34–35). The plaintiffs further allege that an updated FBA would have shown marked behavior improvement.

31

(Doc. No. 48 ¶ 22.) Further, the plaintiffs argue that the results of the December 2021 FBA—completed slightly over a year before the early-2023 IEP meetings—were "not transferable to a different setting" because, as Hopp noted, a less controlled environment "may evoke different responses." (Doc. No. 53 at 11.) According to the plaintiffs, Hopp did not even successfully *complete* an FBA. (Doc. No. 53 at 11.) As the plaintiffs put it, "the FBA that Hopp *attempted* had *failed* for 'not enough data' and its 'highly controlled environment." (*Id.* (citing Doc. No. 17 at 181, 2021 WCS FBA at 11) (emphasis added).)

Therefore, according to the plaintiffs, the last legitimate FBA the district relied on while developing the IEP and BIP was a 2019 FBA—from when J.L. was in elementary school. (Doc. No. 53 at 12.) "Unfortunately, operating off an elementary school FBA and BIP, WCS offered a highly restrictive non-classroom placement." (*Id.*) Relying on an outdated FBA, the plaintiffs argue, violates the IDEA. "Refusing to . . . update[] behavioral supports, believing they are 'futile or useless in light of his disability,' is impermissible." (Doc. No. 53 at 25 (quoting *L.H.*, 900 F.3d at 795).) Tennessee regulations, according to the plaintiffs, require an FBA under the circumstances in this case. (Doc. No. 53 at 26 (quoting *S.L. v. Rutherford Cnty. Bd. of Educ.*, No. 3:24-cv-00601, 2024 WL 3826415, at *3 (M.D. Tenn. Aug. 14, 2024) (quoting Tenn. Comp. R. & Regs. 0520-01-09-.24(3))).)

Second, WCS's draft IEP proposed that J.L. would attend school without peers. This precluded any valid, future FBA: "an FBA and BIP must utilize an environment around students to learn the antecedents to the behaviors." (Doc. No. 48 ¶ 25; *see also* Doc. No. 53 at 12 ("An FBA could not be reliably completed in this non-classroom environment.").) The plaintiffs' proposal—pursuant to which J.L. would be in all-day classes with peers—by contrast, "*would* permit a classroom FBA." (Doc. No. 53 at 13 (emphasis in original).)

32

### 3. *The defendant's argument*

The defendant again begins with a waiver argument. WCBOE argues that, while the plaintiffs' motion "focuses primarily on claims that WCBOE made a highly restrictive placement decision in 2023 without current data from an FBA and BIP immediately prior to such placement determination," the plaintiffs' "underlying [due process] complaint failed to assert any such claims thereby prohibiting WCBOE from defending itself against such claims." (Doc. No. 54 at 20.) "In fact," the defendant adds, "the words 'functional behavior assessment' and/or 'FBA' do not exist in Plaintiffs' [due process] complaint." (Doc. No. 54 at 20 (emphasis in original).) The defendant also includes this argument as one of its affirmative defenses. (Doc. No. 52 ¶ 1 (Affirmative Defenses).)

Next, the defendant argues that the plaintiffs have not shown that the December 2021 FBA was invalid and that, contrary to the plaintiffs' claims, the analyst who completed the assessment did not state or imply that the assessment was compromised. Instead, when the district analyst wrote that assessment in a less-restrictive environment may elicit different response, she meant that, *even in* a controlled, low-stress, one-one-one setting, J.L. "engaged in negative vocalizations, noncompliance, shouting out, throwing writing utensils, and aggression towards his teacher." (Doc. No. 54 at 22.) The defendant reads the assessment to indicate that, because J.L. manifested these behaviors in a "highly structured, high accommodated setting in the school," his behavior would likely be *more* problematic in a general education setting, not less. (*Id.*)

Nor, the defendant argues, have the plaintiffs shown that the December 2021 FBA is not current. First, the defendant argues that neither the IDEA nor Tennessee regulations require an FBA other than in a disciplinary removal (Doc. No. 54 at 23 (citing 34 C.F.R. § 300.530(d), (f))— which this case does not present—and that, when such an FBA is required, it must happen "immediately prior to . . . placement." (*Id.*) In fact, the defendant points out, federal regulators

33

have stated, "[w]e believe it would be inappropriate to specify through regulation what constitutes a 'current' or 'valid' functional behavior assessment as such decisions are best left to the . . . IEP Team." (Doc. No. 54 at 23–24 (quoting Assistance to States of the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46540, 46721 (Aug. 14, 2006)).)

Moreover, according to the defendant, the plaintiffs have not shown that the behaviors identified in the 2021 FBA had ceased in 2023. Other than unsupported statements to that effect, the plaintiffs did not proffer any evidence and would not permit the school district to obtain information from S.L.'s previous, unilateral placement—Galileo Academy. (Doc. No. 54 at 24–25.) In fact, the defendant states that hearing testimony from Galileo staff reveals that the problematic behavior continued. (Doc. No. 54 at 25.)

Last, the defendant argues that, with current, valid behavior information, it formulated an appropriate IEP and BIP. (Doc. No. 54 at 26.) Considering the available information, the IEP Team "had concerns about J.L.'s ability to participate in [S.L.'s proposed placement] without substantial disruption" to other students "in the general education setting." (Doc. 54 at 27–29.) But notwithstanding the WCS's concerns, the defendant states that, "based on input from the parent that J.L.'s behaviors had improved, the team appropriately proposed a less restrictive setting than [homebound] or [a TDS]." (Doc. No. 54 at 28.) Such a placement would have allowed the school "to obtain additional data and give [J.L.] an opportunity to build rapport with the staff at Spring Station." (Doc. No. 54 at 28–29.) As the PWN states, the Team would "hold another meeting after approximately 4 weeks after [J.L.]'s return to Spring Station Middle School to review data and make adjustment where appropriate/needed." (Doc. No. 16 at 1359, Feb. 27, 2023 PWN.)

34

4. *The ALJ's findings*

The ALJ determined that J.L. was provided a FAPE in the LRE under the IDEA for the 2022–2023 school year. (Final Order at 40.) In relevant part, the ALJ determined that "J.L.'s unique circumstances prevent him from the ability to make appropriate progress toward his IEP's goals in the regular education setting, even with appropriate supplemental aids and services." (*Id.* at 39.) Moreover, and most important to the ALJ's findings, "there was extensive proof from evaluation reports and testimony of J.L.'s significantly disruptive and violent behaviors." (*Id.* at 35.) And, notwithstanding S.L.'s "unsupported comments that maturity and medications had helped to alleviate some of J.L.'s DMDD behaviors," the defendant's expert witness opined that "J.L. had not shown improvement in the severity of his behaviors such that he would not disrupt a regular classroom." (*Id.*)

The ALJ found that the IEP Team "reviewed a December 2021 FBA completed by a board-certified behavior analyst." (*Id.* at 20, 22 ¶¶ 96, 109.) And the IEP team proposed a BIP based on the 2021 FBA. (*Id.* at 22 ¶ 108.) The ALJ found that the FBA showed that, "even with a one-on-one home setting, J.L. engaged in negative vocalizations, noncompliance, grunts, groans, shouting, throwing writing tools, and aggression toward his teacher." (*Id.* at 23 ¶ 110.) And a "home setting allows complete control over the physical environment, thus limiting distractions and demands." (*Id.* at 23 ¶ 111.) The ALJ concluded that "WCS did not simply 'assume' that J.L. couldn't be safely placed in a mainstream environment, it relied on relevant and compelling data." (*Id.*)

The ALJ also reviewed the testimony of the only expert witness to testify—Dr. Clovis Stair, a Knox County school psychologist who works with children with social and emotional

35

dysregulation. (*Id.* at 25 ¶ 128.)[19] The ALJ credited Dr. Stair's opinion that "J.L. had not shown improvement in the severity of his behaviors such that he would not disrupt a regular classroom." (Final Order at 35.)

> 5. *This court's findings*

The court is not persuaded by the defendant's waiver argument. As the defendant itself notes, in J.L.'s Due Process Complaint, one sentence makes up his entire legal claim related to the 2022–2023 school year. It states, in full: "For the current 2022–2023 school year, WCS has issued a PWN which is overly restrictive, a denial of FAPE in the LRE, without *current* supporting data." (Doc. No. 16 at 9, Mar. 2, 2023 Due Process Complaint ¶ 16 (emphasis in original) (citations omitted).) A substantial part of J.L.'s claim for relief, therefore, is that WCS made a determination without current data. As the defendant well knows, FBAs are a significant source of IEP data for students with behavioral disabilities and are sometimes mandated. *Accord S.L.*, 2024 WL 3826415, at *3 (citing Tenn. Comp. R. & Regs. 0520-01-09-.24(3)).

Moreover, it is not "abundantly clear" to this court that the plaintiffs were trying to "sandbag WCBOE to prevent it from being prepared to fully defend an FBA claim." (Doc. No. 54 at 21.) A case that the defendants cite in support does not help their case. In *C.F. ex rel. R.F. v. New York City Department of Education*, as the defendant notes (Doc. No. 54 at 20), the court emphasized that the waiver rule "is not to be mechanically applied." 746 F.3d 68, 78 (2d Cir. 2014). And the court noted further that the IDEA "does not require that alleged deficiencies be detailed in any formulaic manner." *Id.* (citing 20 U.S.C. § 1415(b)(7)(A)(ii) ("[the] due process complaint notice . . . shall include . . . a description of the nature of the problem of the child relating

---

[19] The ALJ notes that the plaintiffs "did not object to Dr. Stair's expert status." (Final Order at 25 n.34.)

to such proposed initiation or change")). The plaintiffs' due process complaint adequately put the defendant on notice of their claims. Thus, the defendant's waiver argument fails.

But the defendant's argument on the merits is convincing. The plaintiffs have not met their burden to show that this court should reverse the ALJ's decision. The plaintiffs have not shown that the December 2021 FBA was flawed. Nor have the plaintiffs shown that the behaviors the December 2021 FBA described had ceased; in fact, evidence presented at the hearing showed that J.L.'s behavioral issues persisted.

First, the plaintiffs refer multiple times to the 2021 FBA's statement that "both environments in which the observations for this assessment were conducted were highly controlled and contained a variety of accommodations. Furthermore, observations in a lesser controlled environment or an environment with peers or a different ratio of teacher to student may evoke different responses." (Doc. No. 17 at 171, Dec. 9, 2021 WCS FBA at 1; *see* Doc. No. 53 at 11, 12, 23, 28.) The FBA further notes that, "[i]f [J.L.] was to transition back to a typical school environment, an additional functional behavior assessment should be conducted due to the fact that novel behaviors or duration/frequency of behaviors can differ [from] those displayed in a highly controlled environment." (Doc. No. 17 at 183, Dec. 9, 2021 WCS FBA at 13). The plaintiffs interpret these statements as sufficient to render the 2021 FBA invalid or incomplete. But the court agrees with the ALJ's finding that the record does not support this claim. In addition, while the excerpts the plaintiffs cite, with no context, could be interpreted to imply that, in a *less* restrictive, less-controlled environment with fewer accommodations, the behavioral issues would not be present, that is an unsupported inference, given the body of evidence, and particularly troublesome, given the plaintiffs' burden.

The plaintiff points this court to a case "with similar facts" (Doc. No. 53 at 26), where the Third Circuit affirmed the district court's finding that a school district's refusal to conduct an FBA—despite two independent evaluations recommending it—constituted a denial of FAPE. *Upper Darby Sch. Dist. v. K.W. Through T.B.*, No. 23-2650, 2024 WL 3811990, at *1–2 (3d Cir. Aug. 14, 2024). *K.W.* is not similar to this case—there, the school conducted no FBA, despite twice being advised it should.

Second, the plaintiffs do not cite evidence that J.L.'s behavior had improved since the December 2021 FBA. S.L. did tell the IEP Team that J.L. had matured and shown a great deal of behavioral growth. (Doc. No. 16 at 1314, Feb. 7, 2023 IEP at 10.) But the plaintiffs never submitted any other evidence that J.L. had matured and outgrown the DMDD symptoms. (Doc. No. 16 at 309–314, Driver Tr.; *id.* at 755, Thompson Tr.; Doc. No. 17 at 199, Expert Opinion of Dr. Clovis Stair at 9 (Apr. 17, 2023) ("Parents feel [J.L.] has made progress and is now ready to handle a traditional school setting. They feel that the data used to make WCS's proposal was out of date, however, no current data is available other than parent report.").) To the contrary, evidence in the record indicates that the behavior persisted, as the ALJ and defendants note. (*See* Final Order at 23 ¶¶ 110–11, 26–27 ¶¶ 133–34, 35; Doc. No. 54 at 22–26.)

Furthermore, the ALJ found that "there was extensive proof from evaluation reports and testimony of J.L.'s significantly disruptive and violent behaviors." (Final Order at 35.) For example, J.L.'s parents sought to have J.L. reenroll in WCS in Spring 2023. In the preceding fall, J.L. had been a student at Galileo Academy. The ALJ found that, while attending Galileo, "J.L. had behavior challenges with the other students; he struggled being socially appropriate and making friends. At times, J.L. had to be removed from lunch and other social activities." (Final Order at 18 ¶ 87.) "J.L. also had trouble staying focused and had meltdowns. . . . J.L. would get

very, very angry, have very negative self-talk, and express suicidal ideations at times. There were times J.L. would get frustrated and just yell." (*Id.* at 19 ¶ 88.) This account is supported by hearing testimony from Galileo staff. (*See* Doc. No. 16 at 601–608, Oliver Tr..) The plaintiffs acknowledge and do not dispute the ALJ's findings in this regard, noting, though, that "J.L. attended Galileo without on-site teachers, and without *any* behavioral supports." (Doc. No. 53 at 11 n.8 (emphasis in original).)

For this reason, the WCS members of the IEP Team proposed that "a partial school day in an independent work environment with 1-to-1 support was the most appropriate service . . . to transition [J.L.] back to a traditional school environment." (Doc. No. 16 at 1360, Feb. 27, 2023 PWN at 3.) This decision was "[b]ased off of previous reports and assessments (both school and outside agencies), behaviors demonstrated in the last school setting for which WCS has teacher operations and reports along with WCS staff observations and reports from working with [J.L.]." (*Id.*) The proposed IEP would have placed J.L. in a special education setting so that the district could obtain additional data and make changes as needed in a follow-up meeting "approximately 4 weeks after [J.L.]'s return to Spring Station Middle School to review data and make adjustment where appropriate/needed." (Doc. No. 16 at 1359, Feb. 27, 2023 PWN at 2.) The district's expert psychologist agreed with this placement determination and noted specifically:

> I like that it was a short-term placement, that we were saying give us four weeks to see how is he going to do. . . . [L]et's bring him to his zoned school and collect real-life data right now . . . and if he's doing as well as the parent thinks he's doing, in four weeks we write a better IEP than this one. And if the parent is not accurate in how he's able to handle it, at least we had him in an environment where he and those around him could be safe.

(Doc. No. 16 at 836, Stair Tr.) The ALJ credited Dr. Stair's analysis. (Final Order at 38–39.)

The IDEA has a "strong preference for mainstreaming handicapped children." *L.H.*, 900 F.3d at 789 (internal citation and quotation marks omitted.). "This preference is not absolute, however, and a school may separate a disabled student from the regular class . . . when . . . the student would be a disruptive force in the regular class." *Id.* (citing *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983)).

"WCS' position is not that it would be too difficult or challenging to mainstream J.L. but that it can't be done in a way to keep J.L. and others safe based on the results of evaluations and Dr. Stair's expert opinion. . . . [D]espite supplemental aids or services, J.L. would be a disruptive force in a regular class." (Final Order at 35.) As the Final Order describes it, WCS needed more data, and the proposed four-week, in-school, one-on-one, special education trial "would allow time to gather that information." (*Id.* at 36.) The ALJ determined that J.L. was provided FAPE in the LRE under the IDEA for the 2022–2023.

This court does not find that the "evidence before [it] is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *M.Q.*, 62 F.4th at 990 (quoting *Burilovich*, 208 F.3d at 567), *reh'g denied*, 2023 WL 3063506 (6th Cir. Apr. 12, 2023). Therefore, it does not find that the defendant violated J.L.'s rights under the IDEA during the 2022–2023 school year, and it cannot reverse any of the Final Order's determinations.

## VI.    CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Judgment (Doc. No. 53) will be denied.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge